[No. S010808. June 10, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
JACK GUS FARNAM, Defendant and Appellant.

**COUNSEL**

Samuel D. McVey, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, John R. Gorey, Robert Henry and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—Defendant Jack Gus Farnam was convicted by a jury of one count of first degree murder (Pen. Code, § 187, subd. (a)),[1] one count of rape (§ 261), and one count of sodomy (§ 286). The jury found true the special circumstances that defendant committed the murder while engaged in burglary, robbery, rape, and sodomy (§ 190.2, subd. (a)(17)), and that defendant previously had been convicted of first degree murder (§ 190.2, subd. (a)(2)).

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

After a penalty trial, the jury returned a verdict of death and the trial court imposed that sentence. Appeal to this court is automatic. (§ 1239, subd. (b).)

We find no prejudicial error at the guilt or penalty phase of defendant's trial, and affirm the judgment in its entirety.

## I. FACTS

### A. *The Guilt Phase*

On November 19, 1982, Lillian Mar, a 55-year-old Asian widow, was brutally murdered in her home. The prosecution theorized that defendant, then 18 years old, used a knife to cut an opening in a locked screen door and thereby gained access to the downstairs living room through an open, adjacent, sliding glass door. He attacked Mrs. Mar in her upstairs bedroom, bludgeoning her head before raping and sodomizing her. Mrs. Mar then moved or was moved to the hallway, where defendant struck her and then strangled her with a scarf he had brought. Defendant ransacked the bedrooms, taking various items, and escaped through a side door in the living room.

The prosecution sought to establish the special circumstances that defendant murdered Mrs. Mar while engaged in burglary, robbery, rape, and sodomy, and that defendant was previously convicted of murder. Pursuant to a stipulation between the parties, the court informed the jury of defendant's admission that he previously had been convicted of the first degree murder of Barbara Griswold on or about September 10, 1985.

### 1. *The Prosecution Case*

At the time of the crimes, Mrs. Mar owned a seven-unit apartment building in Los Angeles, where she lived with an adult son, Harry Mar. The ethnic composition of the neighborhood was predominantly Asian, mainly Chinese, with a few Latinos. Mrs. Mar socialized with very few people—her close-knit family and a small group of older Chinese women from the neighborhood. No Caucasians visited her.

On November 19, 1982, sometime between 7:00 and 7:15 p.m., Harry and his fiancée, Patricia, left the apartment together for an evening outing. Mrs. Mar remained at home alone. Around midnight, Harry found his mother's bloodied body in the upstairs hallway.

Police investigators made the following observations at the apartment. The downstairs of the Mar apartment was relatively undisturbed, with the

exception of an L-shaped slit in a locked screen door outside a sliding glass door and a severed cord to the telephone on the floor next to the couch in the living room. There were no pry marks on the front door or the sliding glass door. None of the entertainment equipment in the living room had been tampered with, and envelopes containing large sums of money were in plain view in the adjoining den. The deadbolt on a side exit door in the living room, which was always kept locked, was unlocked.

At the top of the stairs, Mrs. Mar was lying facedown in a pool of blood in the hallway. She was naked from the waist down, and several buttons were missing from her blouse. A bloody scarf was knotted around her neck, and it appeared she had been bludgeoned, strangled, and possibly raped. A loose, light brown-blondish hair was found on the right side of Mrs. Mar's neck.

A woman's panty and pants, with what appeared to be bloodstains, were rolled together in a ball on the floor at the foot of the bed in Mrs. Mar's bedroom. Nearby were buttons similar to those missing from Mrs. Mar's blouse, broken hair curlers, blood drops, and milky or clear fluid stains resembling semen on the carpet. Blood drops were on the bedspread, and impressions apparently left by buttocks, the lower portion of a body, and elbows were at the foot of the bed. Blood drops trailed from Mrs. Mar's bedroom to where her body was found in the hallway.

The other bedrooms bore evidence of ransacking. In Harry's bedroom, the drawers of his nightstand and desk had been pulled out and personal belongings were strewn about. The bedroom formerly belonging to his brother, Jerry, also had been disturbed. And like the downstairs telephone cord, the cord to the telephone outside Harry's bedroom had been cut. Harry later discovered that various items were missing from the residence, including a gold necklace, envelopes of money from the dresser in his mother's bedroom, some money from his coin bank, a handgun, a tie clip, a Timex watch, and two silver coins (balboas).

Dr. Joan Shipley conducted the autopsy and determined the cause of Mrs. Mar's death was asphyxia due to ligature strangulation. The victim exhibited blunt force injuries on the back of the head and a fairly large and severe wound on the right shoulder. The victim had additional wounds on the eyelids, the inside and outside of the lips, underneath the jaw, and the back of the ears. All of the wounds, including the head wounds, occurred prior to death.

Dr. Shipley observed no abnormalities during an external visual inspection of the victim's vagina. Although Dr. Shipley did not detect any visible

signs of rape, she opined her examination was not inconsistent with a rape having taken place.

A sexual assault kit was used to gather evidence from Mrs. Mar's body. Swabs were taken from areas including the external genital area, the vagina, and three inches inside the anal cavity; slides and smears were then made from those swabs. The contents of this kit were examined twice—first in February of 1983 and then again in 1988. In her 1983 examination, police criminalist Alison Ochiae observed blood on the external genital swabs and the vaginal swabs, intact sperm on the vaginal slides, fragments of sperm (i.e., the heads) on the anal slides, and a small amount of sperm on the external genital slides. In his 1988 examination of these same items, Keith Inman, a private criminalist, observed an unusual abundance of columnar cells on the anal slides, which was indicative of trauma consistent with either sodomy or postmortem decompositional changes.

Evidence taken from Mrs. Mar's bedroom was also examined twice. In 1983, criminalist Ochiae detected intact sperm on carpet fibers at the foot of the victim's bed, but found no semen on the bedspread and no semen on the victim's panty or pants. Subsequently, in 1988, criminalist Inman discovered semen on the bedspread by utilizing a procedure not used by the Los Angeles Police Department in 1983.

The police lifted latent prints from ransacked objects in Harry's bedroom, but could not match them with any suspect for a couple of years. Ultimately it was discovered that defendant's right middle and right ring fingerprints matched the latent prints from Harry's coin bank with as many as 20 points of comparison. A print of defendant's right thumb matched the latent print taken from Harry's stethoscope box, with over 10 points of comparison.

Serological analysis disclosed that Mrs. Mar's blood was type AB and her PGM subtype was 2 minus 1 plus. Defendant's blood type was type A and his PGM subtype was 1 plus. Defendant was a secretor, which means his ABO blood type is found in body fluids other than blood, such as semen. Upon examining the carpet fibers from the foot of Mrs. Mar's bed and the items in the sexual assault kit, criminalist Warren Loomis reached the following conclusions: (1) since only a 1 plus PGM subtype was found on the carpet sample, it had to have come from a source other than the victim and from a group comprising 40-43 percent of the population, of which defendant was a member; and (2) since the vaginal, anal, and external genital swabs all exhibited AB and H activity, and since the victim's blood type AB would mask defendant's blood type A in the swabs, defendant could not be excluded as a possible donor of the semen on those items.

Hair analysis indicated that the loose, light brown-blondish hair found on Mrs. Mar's neck was a forcibly removed head hair with Caucasian characteristics that could not have originated from the victim, Harry, or Margaret Lee (the victim's adult daughter, who had curled the victim's hair the evening of the crimes). Comparing the appearance and microscopic characteristics of the loose hair with a sample of defendant's hair, prosecution experts concluded that the two could have a common origin given their similar pigmentation, similar pattern, the abundance and size of their pigment granules, and other characteristics including the cuticle and medulla, the straightness of the hair, and color.[2] One expert opined that violent bumping of the head against something or somebody could be sufficient to dislodge hair from the head.

A tool mark expert compared the cut ends of the two telephone cords at the crime scene with a wood-handled knife that had been found in defendant's possession in January of 1983, some two months after Mrs. Mar's murder.[3] The expert testified that although the severed cords had no individual striations or marks associated with defendant's knife, the cords could have been cut by defendant's knife. Defendant's knife also could have been used to cut the screen door, since the knife's widest part was consistent in width with an offset slit that marked the initial thrust into the screen.

Defendant also demonstrated consciousness of guilt. On February 28, 1986, Detective Kirk Mellecker went to Folsom State Prison to meet with defendant.[4] Upon seeing and recognizing Mellecker in the prison medical office, defendant became stiff and apprehensive.[5] Mellecker indicated he was there to execute a court order for hair and blood samples from defendant. Defendant refused to cooperate, even after Mellecker explained that he had a valid search warrant and that defendant had no choice in the matter. Defendant responded that he did not care, that it was a violation of his rights, and that he was not going to do it. When a correctional sergeant in charge of

[2]The police had also found five loose hairs on Mrs. Mar's bedspread, which were determined to be an Asian person's head hairs that had not been forcibly removed. Although the hairs could not have come from Mrs. Mar, Harry, or Margaret, given their microscopic characteristics, a prosecution expert testified that hairs could cling to a bedspread through laundering or storage, and studies indicated that hairs can remain on garments for several years.

[3]Defendant's possible involvement in the Mar crimes was not discovered until November of 1985.

[4]Defendant was then incarcerated in Folsom for a different crime.

[5]Mellecker had spoken to defendant the previous month about an investigation where defendant's fingerprints were discovered inside a location. Although Mellecker did not tell defendant that the investigation pertained to the Mar murder, Mellecker had given defendant a business card indicating he was in the Robbery/Homicide Special Division of the Los Angeles Police Department.

hospital security entered the medical office, defendant exhibited a fighting stance. Defendant ultimately agreed to provide the samples "under duress."

### 2. The Defense Case

The defense challenged the testing used to establish that defendant was the donor of the semen found at the crime scene. Defense experts opined that, had other available tests been conducted, the population of possible semen donors would have been narrowed considerably and could have excluded defendant as a donor. The defense also attempted to demonstrate that the autopsy and other forensic evidence did not establish rape or sodomy.

### B. The Penalty Phase

### 1. The Prosecution Case

The prosecution relied on the circumstances of the crimes committed against Mrs. Mar. It also presented aggravating evidence of defendant's prior violent criminal activity on four other occasions: (1) in 1981, defendant sodomized and savagely beat Barbara Griswold in her hotel room before finally killing her; (2) in 1983, he robbed and assaulted Mr. and Mrs. N. in their hotel room; (3) in 1983, he attempted to burglarize Beverly McCarthy's hotel room while she and her son were there; and (4) in 1983, he committed an assault with a deadly weapon on Pasadena Police Officer Thomas Bradley. The Griswold, N., and McCarthy incidents all occurred at nighttime at the Holiday Inn in Pasadena, where the victims were registered as guests. The assault on Officer Bradley occurred within a mile of the same hotel just minutes after the McCarthy incident.

### 2. The Defense Case

A number of family members and friends testified on defendant's behalf. Their testimony included the following mitigating evidence.

Defendant's mother spent several years in mental institutions and was incapable of caring for children. Defendant's father, who also was mentally disabled, had not worked since 1965 and was frequently drunk. Defendant and his older brother, David, were always hungry.

The family led a nomadic existence. Defendant and his brother were unsupervised, and they wandered the streets at a very young age. Defendant's parents never showed any concern over their sons' absences from school.

Defendant's brother bullied and beat him. The two began to burglarize houses, where defendant ate food from the kitchens. As a result of his burglaries, defendant was sent to juvenile camps and homes, but his parents did not visit him there. Defendant's parents never disciplined him or his brother.

When defendant was about 13 years old, he met Arlene Reynolds, her son Jace Tompkins, and her daughter, Dorian Jackson. Defendant lived with this family off and on for five years and was always respectful. Defendant once saved Reynolds's life on a rafting trip. Tompkins recalled that defendant once tried to commit suicide by hanging himself.

Defendant became romantically involved with Reynolds's granddaughter, Shawn. Their son was born on March 4, 1983.

Dr. Alvin Davis, a psychiatrist, evaluated defendant three times in 1986 and once in 1988. From his 1986 interviews, Dr. Davis observed that defendant appeared depressed and had an IQ in the very low normal range of 75 to 80. Defendant met diagnostic criteria for conduct disorder, socialized aggressive type, manifested by a history of violence toward persons and property. He did not, however, have an antisocial personality disorder because he was capable of forming relatively permanent attachments to others and of feeling remorse and concern. Nor did he have a borderline personality disorder. Although defendant had expressed a desire for treatment and therapy, he never received any.

In 1988, Dr. Davis noticed that defendant exhibited a marked improvement. Defendant had been reading and taking education courses, and his IQ had increased to the low normal range, somewhere between 92 and 100. He expressed more clearly and verbally his remorse for his offenses. Although Dr. Davis noted that defendant continued to be depressed and possibly suicidal, defendant was no longer a danger to others or to property.

Defendant took the stand and testified on his own behalf. He testified at length about his undisciplined upbringing, the family's frequent moves and their stays in shelters and missions, and the crimes he and his brother used to commit.

Defendant admitted that he robbed, raped, and killed Mrs. Mar. He denied, however, that he sodomized her or that he killed her intentionally or with premeditation. He testified he was really sorry that Mrs. Mar was dead.

Defendant refused to discuss any matter relating to the Griswold murder because he was appealing his conviction for that crime.

## II. Discussion

### A. *Jury Selection and Juror Bias Issues*

#### 1. *The Defense's Challenges for Cause*

Defendant contends the trial court improperly denied his challenges for cause to Jurors Lucas D., Thomas V., Joseph O., and John S., who he claims were prejudicially disposed in favor of the death penalty. He asserts that his federal constitutional right and his state constitutional and statutory rights to an impartial jury were violated by the court's failure to adhere to *Wainwright v. Witt* (1985) 469 U.S. 412 [105 S.Ct. 844, 83 L.Ed.2d 841].

■ "A prospective juror may be challenged for cause based upon his or her views regarding capital punishment only if those views would ' "prevent or substantially impair" ' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*People v. Cunningham* (2001) 25 Cal.4th 926, 975 [108 Cal.Rptr.2d 291, 25 P.3d 519], quoting *Wainwright v. Witt, supra,* 469 U.S. at p. 424 [105 S.Ct. at p. 852]; *People v. Weaver* (2001) 26 Cal.4th 876, 910 [111 Cal.Rptr.2d 2, 29 P.3d 103].) "Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. [Citation.]" (*People v. Weaver, supra,* 26 Cal.4th at p. 910.) On appeal, we will uphold the trial court's decision if it is fairly supported by the record, and accept as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has given conflicting or ambiguous statements.[6] (*People v. Weaver, supra,* 26 Cal.4th at p. 910; *People v. Cunningham, supra,* 25 Cal.4th at p. 975.)

■ "To preserve a claim of trial court error in failing to remove a juror for bias in favor of the death penalty, a defendant must either exhaust all peremptory challenges and express dissatisfaction with the jury ultimately selected or justify the failure to do so." (*People v. Williams* (1997) 16 Cal.4th 635, 667 [66 Cal.Rptr.2d 573, 941 P.2d 752]; see *People v. Cunningham, supra,* 25 Cal.4th at p. 976.) Here, the defense did not exercise a peremptory challenge to Juror Lucas D., who served as an alternate juror throughout the guilt phase and as an actual juror in the penalty phase, even though defendant had several peremptory challenges remaining when the alternate jurors were sworn in. Moreover, it is arguable whether the defense even challenged

---

[6]Defendant cites *Green v. Georgia* (1996) 519 U.S. 145 [117 S.Ct. 578, 136 L.Ed.2d 507] for the proposition that a state appellate court need not give deference to a trial court's findings relating to juror bias. The law in California, however, is settled on the point.

Juror Thomas V. for cause.[7] Nonetheless, even assuming defendant preserved the issue for appellate review, the trial court's retention of the four jurors in question is amply supported by the record.

Although some of Lucas D.'s remarks during the voir dire process could be construed as suggesting he would automatically vote for death at the penalty phase, many other of his comments indicated an ability and a willingness to be fair and open-minded.[8]

On his jury questionnaire, Joseph O. wrote that "if proven guilty, yes, the death penalty should be invoked." In addition, he wrote that he thought "it would cut down on crime if more people were executed." Although these written statements, in isolation, seemingly indicated a pro-death-penalty bias, Joseph O.'s responses during voir dire questioning negated that inference. In any event, Joseph O. was excused long before deliberations ever began in the guilt phase, thereby defeating defendant's claim that he was prejudiced by the trial court's refusal to excuse the juror. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 487-488 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

Although Thomas V. wrote on his jury questionnaire that his general feeling of the death penalty was that "if a defendant is guilty, so be it," he explained that his statement was made without an understanding that there might be options as to penalty. During further questioning, Thomas V. conveyed a willingness to be fair and impartial at the penalty phase.[9]

John S. initially indicated his general philosophy was that all first degree murderers should get the death penalty and nothing else. In responding to questions, however, he stated he could set aside that philosophy and be open to both possible penalties. He further indicated he would be guided by the evidence and would vote for life without the possibility of parole if the evidence persuaded him it was proper.

---

[7]After the prosecution passed for cause on Thomas V., the defense stated, "Not under the responses that the court has heard." The court then responded "Anything further?" before excusing everyone for the day. The court did not appear to rule on any defense challenge for cause, nor did the defense request any such ruling.

[8]Lucas D. thrice said he would *not* always vote for the death penalty over life imprisonment without the possibility of parole, "no matter what evidence was presented during trial." And though he said he might be more inclined to vote for the death penalty in light of a prior murder special circumstance, he stated he would "do [his] best" to keep an open mind in determining the appropriate penalty. Lucas D. also thought defendant "would have a fair chance of showing [that] he ought not to get the death penalty" and affirmed he would not automatically impose the death penalty if he were to find the defendant guilty and the special circumstance to be true.

[9]Thomas V. repeatedly responded he would not automatically vote for the death penalty. He further stated that he had "no prejudgment on anybody," that he was open-minded and fair, and that he would listen to both sides before deciding the appropriate sentence.

■ Given the conflicting statements made by the four jurors, we cannot say that the trial court exceeded its discretion in finding that none of them held an unalterable preference in favor of the death penalty. The trial court's ruling is fairly supported by the record, and we will not second-guess the court's credibility determinations on the matter. No error appears.

### 2. *The Prosecution's Peremptory Challenges*

After the prosecutor exercised peremptory challenges against five prospective jurors, the defense made a motion pursuant to *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*). Defense counsel noted that four of those potential jurors had been Black (Sheila C., Norman T., John G., and Helena B.) and stated, "I think that speaks for itself." The court denied the motion, evidently agreeing with the prosecutor that a prima facie showing of discrimination had not been demonstrated. Nonetheless, it allowed both sides to make a record for appellate purposes. Thereafter, the court reiterated its rejection of the motion, stating that the excusals "appear to be well justified based upon the subjective observations of the prosecution and having nothing to do with racial bias." The jury that ultimately was sworn in consisted of four Blacks and eight Whites, and the alternate panel consisted of two Blacks and four Whites.

Defendant contends the denial of his *Wheeler* motion violated the federal equal protection clause and his federal and state constitutional rights to a trial by a jury drawn from a representative cross-section of the community. (*Powers v. Ohio* (1991) 499 U.S. 400, 404, 411 [111 S.Ct. 1364, 1367, 1370-1371, 113 L.Ed.2d 411]; *People v. Fuentes* (1991) 54 Cal.3d 707, 713-714 [286 Cal.Rptr. 792, 818 P.2d 75].) He seeks reversal of the judgment and a remand for a new trial. (*Ford v. Georgia* (1991) 498 U.S. 411, 425 [111 S.Ct. 850, 858, 112 L.Ed.2d 935]; *Batson v. Kentucky* (1986) 476 U.S. 79, 100 [106 S.Ct. 1712, 1725, 90 L.Ed.2d 69]; *Wheeler, supra,* 22 Cal.3d at p. 283.)

■ Although a presumption exists that peremptory challenges are exercised in a constitutional manner, those used to remove prospective jurors solely on the basis of membership in a cognizable racial group violate both the federal and state Constitutions. (*People v. Crittenden* (1994) 9 Cal.4th 83, 114-115 [36 Cal.Rptr.2d 474, 885 P.2d 887], relying on *Batson v. Kentucky, supra,* 476 U.S. 79; *Wheeler, supra,* 22 Cal.3d 258; *People v. Arias* (1996) 13 Cal.4th 92, 134 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

The rules governing a *Wheeler* challenge are settled. ■ If a defendant believes the prosecution is improperly using peremptory challenges for a

discriminatory purpose, he or she must raise a timely objection and make a prima facie showing that jurors are being excluded on the basis of racial or group identity. (*People v. Jenkins* (2000) 22 Cal.4th 900, 993 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Arias, supra*, 13 Cal.4th at pp. 134-135.) To establish a prima facie case, the defendant should first make as complete a record as possible. (*People v. Box* (2000) 23 Cal.4th 1153, 1187 [99 Cal.Rptr.2d 69, 5 P.3d 130]; *People v. Crittenden, supra*, 9 Cal.4th at p. 115.) Second, the defendant must establish that the persons excluded are members of a cognizable group. (*People v. Box, supra*, 23 Cal.4th at p. 1187; *People v. Crittenden, supra*, 9 Cal.4th at p. 115.) Third, the defendant must show a strong likelihood or reasonable inference that such persons are being challenged because of their group association. (*People v. Box, supra*, 23 Cal.4th at p. 1188 & fn. 7; *People v. Crittenden, supra*, 9 Cal.4th at p. 115.)

██ When a trial court denies a *Wheeler* motion without finding a prima facie case of group bias, the appellate court reviews the record of voir dire for evidence to support the trial court's ruling. (*People v. Jenkins, supra*, 22 Cal.4th at p. 993; *People v. Crittenden, supra*, 9 Cal.4th at pp. 116-117.) We will affirm the ruling where the record suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question. (*People v. Crittenden, supra*, 9 Cal.4th at p. 117.) Moreover, if we find that the trial court properly determined that no prima facie case was made, we need not review the adequacy of the prosecution's justifications, if any, for the peremptory challenges. (*People v. Turner* (1994) 8 Cal.4th 137, 167 [32 Cal.Rptr.2d 762, 878 P.2d 521].)

Defendant first contends that the trial court's denial of his *Wheeler* motion was based in part on an erroneous belief that defendant had no standing to make the motion because he was White. (See *Wheeler, supra*, 22 Cal.3d at p. 281 [defendant need not be a member of the excluded group to complain of a violation of the representative cross-section rule].) In support of this claim, defendant observes that the court interrupted the prosecution's initial response to the *Wheeler* motion by remarking: "Well, let me indicate for the record, No. 1, the defendant is [W]hite, and, No. 2, a quick check of the jury as presently composed would indicate that six of the remaining 11 are also [B]lack. [¶] I don't know that there is anything else you want to put on the record, Miss Clark [the prosecutor]."

We are not persuaded. As the People point out, the court never stated it was denying the *Wheeler* motion *because* defendant was not the same race as the challenged jurors; at most, it merely observed "for the record" that defendant was White and that six of the jurors remaining in the box were Black. ██ Even though a defendant's race clearly is not dispositive of a

*Wheeler* motion, it is equally clear that the matter remains a subject of proper consideration by the court. (See *People v. Crittenden, supra,* 9 Cal.4th at p. 115 [defendant may support a prima facie showing of group bias by showing that he himself is a member of the excluded group]; *Wheeler, supra,* 22 Cal.3d at p. 281.) Accordingly, it is neither troubling nor problematic that the court noted defendant's race for the record. In the absence of a more persuasive showing, defendant's contention must be rejected.

Defendant next argues that the trial court's "invitation" to the prosecution to provide justifications for its peremptory challenges "could be deemed" an implicit finding of a prima facie case of racial bias. (See *People v. Sims* (1993) 5 Cal.4th 405, 428 [20 Cal.Rptr.2d 537, 853 P.2d 992] ["in general, when the trial court inquires as to the prosecutor's justifications, the court has made ' "at least an implied finding" ' of a prima facie showing"].) We disagree.

The record makes reasonably clear that the trial court did not invite the prosecution to justify its challenges or otherwise inquire as to justifications, but simply acquiesced in the parties' wishes to make a record. Significantly, after the prosecution asked permission to make a record for appellate purposes, the court stated: "All right. In any event, I'm going to deny the motion. You can make your record also, if you wish. I don't know, at least at this point in time, that it's required. [¶] But I think out of an abundance of caution you may, at the conclusion of the proceedings today, or the beginning of the proceedings on Monday, you might at least put on the record whatever it is that you wish to put on the record as to those individuals that have been excluded that were [B]lack." Thereafter, when defense counsel requested that the record be made at the end of the day when memories were still fresh, the court reiterated its earlier ruling, stating, "I have no objection, if it's something that you [defense counsel] and apparently [the prosecutor] wish to put on the record. At least at this point in time I think it's at least apparent to me that it's not an issue." On this record, there is no basis for concluding that a prima facie case of racial bias had been found, implicitly or otherwise.

██ Moreover, substantial evidence supports the trial court's determination that no prima facie showing of racial bias had been shown. Notably, defendant's only stated bases for establishing a prima facie case were that (1) four of the first five peremptory challenges exercised by the prosecution were for Black prospective jurors, and (2) a very small minority of jurors on the panel were Black. Not only does the record appear to disprove the

second factual assertion,[10] but even assuming both assertions were factually accurate, they fall short of a prima facie showing. (*People v. Rousseau* (1982) 129 Cal.App.3d 526, 536 [179 Cal.Rptr. 892] [concluding a prima facie case was not established by defense counsel's statement that " 'there were only two [B]lacks on the whole panel, and they were both challenged by the district attorney' "], cited with approval by *People v. Turner, supra,* 8 Cal.4th at pp. 167-168; see also *People v. Arias, supra,* 13 Cal.4th at p. 136, fn. 15; *People v. Howard* (1992) 1 Cal.4th 1132, 1154-1155 [5 Cal.Rptr.2d 268, 824 P.2d 1315].)

Defendant could not and did not point to anything otherwise supporting a *Wheeler* motion. For example, defendant was unable to show that the prosecutor had struck most or all of the Black members from the venire. (See *People v. Crittenden, supra,* 9 Cal.4th at p. 115.) Defendant did not demonstrate that the challenged jurors " 'share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole.' " (*Ibid.*) Nor did he establish that the prosecutor failed " 'to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all.' " (*Ibid.*) Finally, defendant was not a member of the excluded group, and the victim was not a member of the group to which the majority of the remaining jurors belonged. (*Ibid.*)

As set forth below, the record discloses ample grounds upon which the prosecution might reasonably have challenged Sheila C., Norman T., John G., and Helena B.—the four jurors in question. (*People v. Crittenden, supra,* 9 Cal.4th at p. 117.)

During the voir dire process, Sheila C. indicated her belief that the death penalty is used too often and that life imprisonment is sufficient punishment. She also indicated that she did not like the death penalty and that, if given the opportunity, she would vote in an election to make the death penalty unavailable in California. Although Sheila C. had not been removed for cause, presumably in light of her claimed willingness to be fair and to impose the death penalty if appropriate, the prosecutor might reasonably have challenged her based upon her negative views toward the death penalty. (See *People v. Turner, supra,* 8 Cal.4th at p. 171.)

Norman T. indicated in response to prosecution questioning that he was "generally against" the death penalty, but that "it's not etched in stone." Thereafter, when questioned whether he would "lean heavily in favor of" a life sentence without possibility of parole rather than a death sentence if

---

[10]As explained, the court noted for the record that six of the remaining 11 jurors were Black at the time defendant made his *Wheeler* motion.

given a choice in the instant case, Norman T. accused the prosecutor of "trying to put words in my mouth." Where, as here, a prospective juror evinces reservations against the death penalty (*People v. Turner, supra,* 8 Cal.4th at p. 171) and demonstrates a degree of hostility toward the prosecutor (see *People v. Cummings* (1993) 4 Cal.4th 1233, 1282 [18 Cal.Rptr.2d 796, 850 P.2d 1]), the prosecutor might reasonably challenge the juror. Norman T. additionally indicated a belief that "lack of justice goes with lack of money" and mentioned his work at a juvenile hall. Since defendant was a young offender from a poor background who was being represented at trial by appointed counsel, the prosecutor might reasonably have challenged Norman T. in the belief that he might feel a special sympathy for defendant.

During the voir dire process, Helena B. disclosed that she previously served as a juror in a case that resulted in a hung jury. Since one who has had such an experience "constitutes a legitimate concern for the prosecution, which seeks a jury that can reach a unanimous verdict" (*People v. Turner, supra,* 8 Cal.4th at p. 170), the prosecutor might reasonably have chosen to challenge Helena B.

John G. disclosed that "on a couple of occasions" in the previous year he visited a nephew incarcerated in Chino. Although John G. claimed that the experience would have no impact on him as a juror, a prosecutor may reasonably surmise that a close relative's adversary contact with the criminal justice system might make a prospective juror unsympathetic to the prosecution. (*People v. Arias, supra,* 13 Cal.4th at p. 138; see *People v. Williams, supra,* 16 Cal.4th at pp. 664-665, 666; *People v. Cummings, supra,* 4 Cal.4th at p. 1282.)

In sum, substantial evidence supports the trial court's determination that no prima facie showing of racial bias had been made. No *Wheeler* error appears.

In light of our conclusion that the trial court properly found no prima facie case of racial bias, we need not review the prosecutor's justifications for her peremptory challenges or the trial court's weighing of those justifications. Nonetheless, we have reviewed all of defendant's claims on these matters, and, even were we to assume that a prima facie case had been or should have been found, we would find such claims lacking in merit based on the record before us. Suffice it to say, the prosecutor articulated her belief that each of the four challenged jurors harbored a pro-defense bias, based upon many of the specific matters identified above and upon other matters covered during the voir dire; such concerns furnished ample bases for the trial court's subsequent conclusion that the peremptory challenges appeared "well justified based upon the subjective observations of the prosecution and having

nothing to do with racial bias." Moreover, defendant does not establish that the trial judge failed to fulfill his legal obligations faithfully. Although the judge had commented that he did not "really think too much of *Wheeler* motions," he subsequently clarified that he simply thought the motion frequently was misused. Given the judge's explanation of his comments and his actions in allowing both sides to make their cases, we cannot conclude that he harbored a preexisting bias that prevented him from fully and fairly considering defendant's particular *Wheeler* motion.[11]

### 3. *The Defense's Motion to Discharge Four Jurors for Good Cause*

During the guilt phase of trial, Jurors Violet J., Virginia W., Lillian C., and Mary H. were returning to the court from lunch when four men stopped Virginia W. to ask for the time. One of the men then jumped toward Violet J. and knocked her to the ground. He took her purse and ran up the hill before police officers apprehended him. Although Violet J. saw no weapon, she was told by police that the man had a knife.

The trial court questioned these four women outside the presence of the other jurors. Although Violet J. said she felt "shook up" and "not coherent enough to drive home," she believed she could listen to the testimony and pay attention to the case. The other three jurors also indicated they would have no problem staying and listening to the testimony. The trial court admonished all four jurors to not discuss the incident with the other jurors, and emphasized that the incident had no relationship to defendant's case and that nothing that happened should "spill over as it relates to" defendant. The trial resumed, and counsel took turns questioning one witness for approximately five minutes before the evening recess was called.

The next day, the defense moved for a mistrial on the grounds that (1) Violet J., Virginia W., Lillian C., and Mary H. were all of similar age to the victim in defendant's case, and (2) the incident involved a situation similar

---

[11]As indicated, defendant further claims that the prosecution's peremptory challenges violated his rights under the federal Constitution, including the federal equal protection clause. In turn, the People argue that defendant's failure to raise these particular objections in trial court forfeits such claims on appeal. (See *People v. McPeters* (1992) 2 Cal.4th 1148, 1174 [9 Cal.Rptr.2d 834, 832 P.2d 146].) No matter. Because essentially the same standard applies under either *Wheeler, supra,* 22 Cal.3d 258, or *Batson v. Kentucky, supra,* 476 U.S. 79 (see *People v. Alvarez* (1996) 14 Cal.4th 155, 192-193 [58 Cal.Rptr.2d 385, 926 P.2d 365]), and because defendant fails to show that his rights under California law were violated, the point is moot. (See *People v. Catlin* (2001) 26 Cal.4th 81, 117, fn. 4 [109 Cal.Rptr.2d 31, 26 P.3d 357].)

in nature to the charges against defendant. The defense also moved to discharge the four jurors and to replace them with alternates.[12]

At the defense's request, the trial court allowed counsel to question Juror Violet J. with no other jurors present. Violet J. admitted that the experience was very terrifying, but indicated she did not think it would affect her ability to be impartial in a case involving an allegation of robbery. She also stated she would have no difficulty separating the purse-snatching incident from her duties as a juror and said she could be fair to defendant and evaluate his case and the evidence fairly.

The trial court next questioned the other three jurors who witnessed the robbery. Virginia W. admitted she was considerably upset over the incident, but denied her thought process would be affected in making findings in defendant's case. When the trial court emphasized that the incident and defendant's case had "no relation whatsoever" to each other, Virginia W. agreed. Jurors Lillian C. and Mary H. also affirmed that witnessing the incident would not create a problem for them in deciding defendant's case.

At the conclusion of the hearing, the trial court declined to discharge the four jurors and denied the mistrial motion. The court found that the jurors appeared to be "calm, cool and collected" and able to separate the purse-snatching incident from defendant's case. Violet J. served throughout the guilt and penalty phases of trial. Virginia W. was excused just prior to guilt phase deliberations. Mary H., an alternate at the time of the robbery, later deliberated on both guilt and penalty. Lillian C. remained an alternate throughout the trial. At the close of the trial, defense counsel again argued that all four jurors should have been excused for bias.

Defendant contends on appeal that the trial court's failure to discharge the four jurors resulted in a trial before a biased jury in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and his rights under corresponding state constitutional provisions. In particular, he complains that the trial court did not conduct an adequate and individual inquiry of the four jurors to discover bias, and that it erred in determining that the four jurors could be objective.

Section 1089 authorizes a trial court to discharge a juror if, among other reasons, "good cause" is shown that the juror is "unable to perform [her]

---

[12]The People urge us to find that defendant forfeited any appellate right to complain that he was denied the opportunity to be tried by an unbiased jury pursuant to the federal and state Constitutions because he failed to specifically identify such provisions at trial. We decline to do so, finding on this record that defendant adequately preserved such objections.

duty."[13] When a trial court is put on notice that good cause to discharge a juror may exist, "it is the court's duty to make whatever inquiry is reasonably necessary to determine if the juror should be discharged and failure to make this inquiry must be regarded as error." (*People v. Burgener* (1986) 41 Cal.3d 505, 520 [224 Cal.Rptr. 112, 714 P.2d 1251], overruled on another point in *People v. Reyes* (1998) 19 Cal.4th 743 [80 Cal.Rptr.2d 734, 968 P.2d 445]; see *People v. Williams* (1997) 16 Cal.4th 153, 231 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

"Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a 'demonstrable reality.' The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence. [Citation.]" (*People v. Holt* (1997) 15 Cal.4th 619, 659 [63 Cal.Rptr.2d 782, 937 P.2d 213]; see also *People v. Williams, supra,* 16 Cal.4th at p. 232.)

 Contrary to defendant's assertions, the trial court's inquiry was more than adequate. The court held two separate hearings on the matter, and ascertained the details of the purse-snatching incident. In both hearings, the trial court queried whether the four jurors understood the absence of any relation between the incident and the crimes allegedly involving defendant. The court was obviously aware that the purse snatching might interfere with the jurors' ability to sit in judgment of defendant, and the questions put to the jurors reflected that awareness. And although the court was not obligated to do so, it allowed each side to question Violet J. directly. Upon hearing the four jurors' responses regarding their state of mind and observing their demeanor, the court had ample basis for determining whether they could fulfill their obligations as jurors. No more was required.

In reaching this conclusion, we reject defendant's assertion that Jurors Virginia W., Lillian C., and Mary H. should not have been questioned together. Defendant cites no legal authority compelling individual, sequestered questioning, and the trial court's decision not to do so was well within its discretion under the circumstances. Moreover, while defendant complains on appeal that the court asked leading questions concerning the three jurors' states of mind, the court had previously covered the topic with open-ended

---

[13]We reject any suggestion that a case of juror misconduct might be established on the basis of the appellate record here. (See *In re Hamilton* (1999) 20 Cal.4th 273, 294 [84 Cal.Rptr.2d 403, 975 P.2d 600] [juror misconduct occurs when there is a direct violation of the oaths, duties, and admonitions imposed on jurors, such as when a juror conceals bias on voir dire, consciously receives outside information about the case on which she sits, discusses the case with nonjurors, or shares improper information with other jurors].)

questions. The jurors were consistent in their responses. In addition, the trial court made whatever inquiries were requested by the defense, and terminated questioning only after the prosecution and the defense each affirmatively indicated that no further inquiry was desired.

Defendant next argues that the trial court prejudicially erred in refusing to excuse the four jurors in question. We disagree. The record contains substantial evidence to support the trial court's conclusion that good cause did not exist to excuse the jurors. As indicated, each of the four jurors expressed an understanding that the purse snatching had no relation to the crimes allegedly involving defendant, and each indicated that she could be fair.

Although the record amply supports the trial court's ruling, defendant points to Violet J.'s frank statement that "still things come into your mind of what happened to you and you can only try to visualize what happened to the other person." Violet J.'s comment, however, appeared to reveal her honesty in conveying what someone in her position might feel, rather than a bias against defendant or an inability to fulfill her duties as a juror. Given the balance of Violet J.'s responses, the trial court's observation of her demeanor, and the minimal similarity between the purse-snatching incident and the crimes involving Mrs. Mar, the trial court was not bound to find that Violet J. had formed emotional and psychological bonds with the victim such that she would be unable to remain objective during defendant's trial. (Cf. *People v. Diaz* (1984) 152 Cal.App.3d 926, 939 [200 Cal.Rptr. 77] [addressing likelihood of subconscious bias where juror previously experienced the same type of violent physical assault that the defendant was accused of committing].) On this record, we see no basis for upsetting the judgment.

B. *Guilt Phase Issues*

1. *Sufficiency of Sodomy Evidence*

 Although defendant does not argue the evidence is insufficient to support the rape conviction and the rape-murder special-circumstance finding, he challenges the sufficiency of the evidence pertaining to the sodomy conviction and the sodomy-murder special-circumstance finding.

 "In considering a claim of insufficiency of evidence, a reviewing court must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.]" (*People v. Earp* (1999) 20 Cal.4th 826, 887 [85 Cal.Rptr.2d 857, 978 P.2d

15].) "The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].) "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt." (*Id.* at pp. 1053-1054.) Simply put, if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding. (*Id.* at p. 1054; *People v. Earp, supra,* 20 Cal.4th at pp. 887-888.)

Section 286, subdivision (a) defines sodomy as the "contact between the penis of one person and the anus of another person. Any sexual penetration, however slight, is sufficient to complete the crime of sodomy."[14] "[T]he offense of sodomy requires that the victim be alive at the time of penetration." (*People v. Ramirez* (1990) 50 Cal.3d 1158, 1176 [270 Cal.Rptr. 286, 791 P.2d 965], fn. omitted.)

 Here, the prosecution presented the following evidence. The body of the victim had been found naked from the waist down. When Detective Randy Adair arrived at the Mar residence on the night of the murder, he observed indentations on the victim's bed that were consistent with sexual activity having occurred at the foot of the bed. Semen found on the bedspread and on carpet fibers at the foot of the bed provided further evidence that sexual activity had occurred. Criminalists found fragments of sperm on slides smeared with a swab taken from three inches inside the victim's anal cavity. Criminalists also observed an abundance of columnar cells on one of the anal slides, which was unusual and indicative of trauma consistent with either sodomy or postmortem decomposition. Viewed favorably to the prosecution, such evidence was sufficient to establish that a sodomy had been committed.

Defendant argues no reasonable trier of fact could have concluded that a sodomy occurred because: (1) there was no evidence of trauma to the rectal opening; (2) there was evidence that the victim's body was moved around and turned over before the anal swabs were taken; and (3) there was "universal medical doctor agreement" that "semen possibly migrated from the vaginal area to the anus." Additionally, defendant points to the possibility that the anal swabs may have come into contact with the sperm cells on the outside of the victim's body, not from inside the anus.

---

[14]At the time of the Mar crimes, the second sentence of the present version of section 286, subdivision (a), was contained in former section 287. (See Stats. 1975, ch. 71, § 9, p. 134, repealed by Stats. 1991, ch. 144, § 2, p. 1353.)

We are not convinced. The existence of alternative theories, other than sodomy, that might possibly have explained the presence of the sperm in the victim's anal cavity, in no way renders the evidence insufficient to support the sodomy conviction. "The finding of sperm in the victim's anus is in itself sufficient evidence of sodomy."[15] (*People v. Thompson* (1990) 50 Cal.3d 134, 171 [266 Cal.Rptr. 309, 785 P.2d 857].) Lack of trauma to a victim's rectum does not preclude a finding that the victim was sodomized. (E.g., *People v. Kraft, supra*, 23 Cal.4th at pp. 1059-1060.) Because the circumstances reasonably justify the jury's findings, we may not reverse the judgment simply because the circumstances might also reasonably be reconciled with defendant's alternative theories. (See *id.* at p. 1054; *People v. Earp, supra*, 20 Cal.4th at pp. 887-888.)

Defendant next argues that, even assuming the evidence sufficiently establishes an anal penetration, there was no substantial evidence that the victim was alive at the time of the act. (See *People v. Ramirez, supra*, 50 Cal.3d at p. 1176.) Specifically, he contends that the lack of trauma or blood in the anal area indicated that no penetration occurred while the victim was alive.

This contention is without merit. As discussed, sodomy upon a live victim may occur without trauma to the victim's rectum. Moreover, the contention disregards the evidence showing that the victim was killed in the upstairs hallway, where her body was found, *after* she had been sexually attacked in her bedroom. Blood drops were found all over the carpet at the foot of the bed, and semen stains were found on the bedspread and on the carpet. Blood on the victim's rolled-up panty and pants, found on the floor near the bed, as well as the pattern of bloodstains on the bedspread, indicated that the victim had been bludgeoned in the head in her bedroom after her clothes had been forcibly removed. More blood drops led into the hallway, indicating the victim moved or was moved there after the sexual attack. Evidence that the victim died in the hallway included postmortem lividity, the position of the victim's left hand, and the blood discharged from her head. On this record, there was ample evidence that the victim was sodomized while alive.[16]

---

[15]We note that in *People v. Clark* (1993) 5 Cal.4th 950, 1017 [22 Cal.Rptr.2d 689, 857 P.2d 1099], a case where the defendant had not been charged with sodomy, we stated that sperm found inside the victim's anus, coupled with evidence showing that victim had been on her stomach at some point during the defendant's alleged assault, did not provide "overwhelming support" for a sodomy theory. Nonetheless, we concluded, such evidence furnished a sufficient basis to justify the prosecutor's references to sodomy during questioning and closing argument. (*Ibid.*)

[16]Moreover, there was no evidence that defendant intended to have sexual contact with a corpse. (See *People v. Ramirez, supra*, 50 Cal.3d at p. 1176.)

## 2. *Prior Murder Conviction*

Section 190.1 provides that, when a death penalty case involves a prior murder conviction special-circumstance allegation, the truth of that allegation shall be determined in a separate proceeding following a finding of first degree murder by the trier of fact. (*Id.*, subd. (b).)[17] In this case, one of the allegations charged that defendant previously had been convicted of the murder of Barbara Griswold. Prior to jury selection, defendant filed a written motion to waive a separate proceeding for determination of that allegation. Defendant and one of his attorneys, Albert Garber, submitted declarations in support of the motion, and counsel argued that a waiver was in defendant's best interests. With the prosecutor's agreement, the trial court accepted the waiver and presented defendant's stipulation to the truth of the prior murder conviction special-circumstance allegation to the jury before its guilt deliberations.[18] The jurors ultimately returned a guilty verdict and a true finding on all of the special circumstance allegations.

■■■ On appeal, defendant contends the trial court violated his federal constitutional right to a fair trial by erroneously allowing evidence of the prior murder conviction to be presented to the jury in advance of guilt deliberations. The trial court, he argues, should not have accepted his waiver of a separate or bifurcated special circumstance proceeding on his prior murder conviction.

Subdivision (b) of section 190.1 (section 190.1(b)) makes clear that a trial court may not force a capital defendant to undergo a unitary trial of the separate issues of the defendant's guilt of first degree murder and the truth of

---

[17]Section 190.1 provides in pertinent part: "A case in which the death penalty may be imposed pursuant to this chapter shall be tried in separate phases as follows: [¶] (a) The question of the defendant's guilt shall be first determined. If the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged as enumerated in Section 190.2 except for a special circumstance charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder in the first or second degree. [¶] (b) If the defendant is found guilty of first degree murder and one of the special circumstances is charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 which charges that the defendant had been convicted in a prior proceeding of the offense of murder of the first or second degree, there shall thereupon be further proceedings on the question of the truth of such special circumstance."

[18]As read in full to the jury, the stipulation provided: "The defendant, Jack Gus Farnam, has admitted that before this trial, he was previously convicted of the first degree murder of Barbara Griswold on or about the 10th day of September, 1985, in case number A 564216, in the Pasadena branch of the Superior Court of the State of California, in and for the County of Los Angeles, in violation of Section 187 of the Penal Code, and within the meaning of Penal Code section 190.2, Subdivision [(a)(2)], as charged in one of the special circumstances in this case. [¶] No further evidence is required for the proof of this charge."

a prior murder conviction special-circumstance allegation. It does not, however, explicitly forbid a defendant from validly waiving a bifurcated trial of such issues in an affirmative, knowing, and voluntary manner. This case presents a question of first impression, that is, does a trial court have the discretion to accept a defendant's express waiver of his statutory right to a separate proceeding?

It is undisputed that section 190.1(b)'s provision for a separate proceeding is intended for the benefit of capital defendants charged with a prior murder conviction special-circumstance allegation. In essence, the statute recognizes that evidence of such a conviction may potentially have an inflammatory effect on jurors who are asked to determine a defendant's guilt or innocence on a current charge of murder.

It is settled, however, that defendants accused of capital crimes may waive important rights conferred to them by constitutional and statutory law. (E.g., *People v. Mayfield* (1997) 14 Cal.4th 668, 738 [60 Cal.Rptr.2d 1, 928 P.2d 485] [defendant may waive federal and state constitutional right of presence at critical stages of a capital trial]; *Cowan v. Superior Court* (1996) 14 Cal.4th 367, 370 [58 Cal.Rptr.2d 458, 926 P.2d 438] [statute of limitations for a lesser offense than that charged]; *People v. Clark* (1990) 50 Cal.3d 583, 617 [268 Cal.Rptr. 399, 789 P.2d 127] [right to counsel in both guilt and penalty phases]; *People v. Memro* (1985) 38 Cal.3d 658, 704 [214 Cal.Rptr. 832, 700 P.2d 446] [statutory right to jury in special circumstance phase of trial]; see also *People v. Trejo* (1990) 217 Cal.App.3d 1026, 1032 [266 Cal.Rptr. 266] [state constitutional right to a jury of 12 persons].)

The reason for this is clear. Generally, permitting waiver " 'is consistent with the solicitude shown by modern jurisprudence to the defendant's prerogative to waive the most crucial of rights.' [Citation.]" (*Cowan v. Superior Court, supra*, 14 Cal.4th at p. 371.) A defendant may waive a right that exists for his or her own benefit, where such waiver is not against public policy. (*Ibid.*)

Defendant offers no convincing reason why section 190.1(b) should be construed to preclude him and other capital defendants from waiving its benefits if they believe it is in their best interests to do so. This is not a situation where the statute itself prohibits or limits waivers. (Cf. *People v. Jackson* (1996) 13 Cal.4th 1164, 1209-1211 [56 Cal.Rptr.2d 49, 920 P.2d 1254] [defendant charged with a felony may not voluntarily waive statutory right under sections 977 and 1043 to be present at trial during the taking of evidence].) Nor is public policy violated by an affirmative, knowing, and voluntary waiver of the statutory right where, as here, a capital

defendant and his counsel determine that the circumstances before them make such a waiver desirable.

Defendant next argues his waiver and stipulation were invalid because he was not fully advised of the penal consequences. Specifically, he complains he was not admonished "that should he be found guilty of first degree murder in the Mar incident, a prior murder special circumstance, without more, would be sufficient to make him eligible for the death penalty." He contends such lack of information was all the more egregious in light of his "very low normal" or "low normal" intelligence and his very low literacy skills. We disagree.

Defendant represented to the court, both in a signed declaration and at hearings on the matter, that his attorneys fully explained the protections of section 190.1(b) to him, and that he was "knowingly" giving up his right to a separate proceeding "with full awareness of the implications." The attorneys themselves likewise assured the court that they explained in considerable detail to defendant "the entire sequence of events that [defendant] would otherwise be entitled to but for this proceeding, including the proceeding by virtue—should this waiver be accepted, and what the procedure would be thereafter."

Moreover, the trial court allowed the prosecutor to question defendant thoroughly in order to ascertain defendant's understanding of his rights and the consequences of stipulating to the prior murder conviction. In response to the prosecutor's questions, defendant affirmed his understanding that, by so stipulating, he would give up his right to have the special circumstance allegation tried by a jury, his right to confront and cross-examine any witnesses regarding the prior conviction, his right against self-incrimination, and his right to call and subpoena witnesses on his behalf in that matter. With the court's permission, the prosecutor then explained to defendant: "The effect of this admission, Mr. Farnam, if the jury finds you guilty of murder in the first degree, this admission alone would cause you to proceed to the penalty phase. Understand, that is even if all the other special circumstances were found not to be true, your admission of this special circumstance of having been convicted previously of murder in the first degree would make you eligible for the penalty phase of this trial." After defendant stated that he understood, the prosecutor emphasized, "That means at the very least, once you're found guilty of murder in the first degree, with this admission, the very least penalty you would get would be life without the possibility of parole." Defendant again stated that he understood.

We find defendant was adequately advised of the consequences of his waiver and stipulation. Even though defendant was not advised in open court

in the precise words identified on appeal, the on-the-record admonishments conveyed substantially the same information to him. Both defendant and his attorneys attested to the fact that counsel thoroughly explained the consequences of the proposed waiver and stipulation to defendant. Nothing in the record raises any doubts about defendant's knowledge or understanding of these matters.[19] Under these circumstances, we are satisfied that defendant acted knowingly, intelligently, and voluntarily in waiving the protections of section 190.1(b) and in stipulating to the prior murder conviction.

 Defendant next argues there was no valid tactical justification for the waiver and that defense counsel provided ineffective assistance by allowing the prior murder conviction to be introduced at the guilt phase.

Defendant first claims that defense counsel mistakenly believed that section 190.1(b) "*only* applied if the prior murder conviction was the *sole* special circumstance." (Italics added.) The claim is without merit. By expressing their awareness that section 190.1(b) was enacted *primarily* for that type of situation, and by offering defendant's waiver to the court knowing that other special circumstance allegations were at issue, counsel demonstrated their clear understanding to the contrary.

 To otherwise demonstrate ineffectiveness of counsel, defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [104 S.Ct. 2052, 2064-2065, 80 L.Ed.2d 674]), and that a reasonable probability exists that, but for counsel's unprofessional errors, the result would have been different. (*People v. Weaver, supra*, 26 Cal.4th at p. 925; *People v. Freeman* (1994) 8 Cal.4th 450, 484 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888].) The standard of review for ineffective assistance claims is well settled. In examining such claims, we accord great deference to counsel's reasonable tactical decisions. (*People v. Weaver, supra*, 26 Cal.4th at p. 925; see *People v. Freeman, supra*, 8 Cal.4th at p. 484.) " 'Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.' [Citation.]" (*People v. Weaver, supra*, 26 Cal.4th at p. 926.)

 Here, trial counsel explained their strategy for the waiver and stipulation in an in camera hearing. Counsel set forth their concern that, if the jurors were to find defendant guilty of first degree murder and to find true the other alleged special circumstances, the jurors might react negatively toward defendant if they were to then learn for the first time about the

---

[19]That defendant may have answered some questions in monosyllabic terms—i.e., "yes,"—does not support the contention that he failed to grasp the import of those questions. Defendant simply was responding to questions calling for a yes or no answer.

prior murder conviction special circumstance. Counsel understood that the factual circumstances of the prior murder—as opposed to the fact of defendant's conviction for the murder—could be devastating and could obfuscate the jurors' ability to judge the case before them, so counsel expressly sought to keep the details of the murder itself out of the guilt phase. However, counsel decided it was in defendant's best interest to make the jurors aware that the topic of a prior murder conviction would be coming up in the future if they were to find defendant guilty. In explaining their tactics, counsel informed the trial court that they consulted other criminal defense attorneys, and that those attorneys agreed that a waiver was in defendant's best interests.

The record in this case amply supports counsel's decision. Defendant was charged with three crimes (first degree murder, rape, sodomy) and five special circumstances (the prior murder conviction special circumstance, plus the four felony-murder special circumstances of burglary murder, robbery murder, rape murder, sodomy murder), and all but the prior murder conviction had to be addressed at the guilt phase. Evidence of the charged crimes and the four felony-murder special circumstances was overwhelming. The severed telephone cords both upstairs and downstairs indicated that the intruder, whoever it was, knew there was someone in the residence and acted to prevent that person from calling for help. That evidence, as well as evidence that envelopes of cash and entertainment equipment were left untouched on the first floor where the intruder slit the screen door to gain entry, tended to negate the inference that the intruder intended merely to burglarize the home. The victim's clothes had been forcibly removed, and sperm was found on vaginal and anal samples taken from her body, as well as on the carpet of her bedroom. Blood evidence and the position of the victim's body indicated she was killed immediately after the sexual attack. The method of killing—strangulation with a scarf brought into the home—reflected premeditation and deliberation. Finally, the bedrooms upstairs had been ransacked, and a number of items were missing after the night of the crimes, including money, jewelry, a gun, and a watch.

Disregarding the prior murder conviction, the evidence of defendant's identity in the Mar crimes was strong—prints of defendant's right middle finger, right ring finger, and right thumb matched latent prints taken from two items in Harry Mar's ransacked bedroom. Additionally, serological analysis, hair analysis, and comparisons of defendant's knife with items found cut at the scene of the crimes all tended to connect defendant with the crimes and failed to exclude him as the perpetrator.

Given the strength of the evidence, counsel could reasonably have believed that a separate proceeding on the prior murder conviction and an

eventual penalty phase were likely. Counsel had to weigh the possible prejudice of presenting the prior murder conviction at the guilt phase against the possible prejudice of the jury's hearing of it for the first time thereafter. In deciding that presentation during the guilt phase would avoid antagonizing the jury without prejudicing determinations on the Mar murder and the four felony-murder special circumstances, counsel knew that none of the circumstances of the prior murder—which, like the Mar crimes, involved sodomy, blows to the victim's head, and a ligature around the neck—would be introduced during the guilt phase. Moreover, counsel conferred with other criminal defense attorneys and found that none of them disagreed with their tactical decision.

Under the circumstances, we cannot fault counsel's decision to recommend the stipulation and waiver to defendant. Our conclusion here is consistent with prior decisions recognizing the validity and reasonableness of analogous tactical decisions. *People v. Freeman, supra,* 8 Cal.4th 450, for example, rejected a claim of ineffective assistance where defense counsel had decided to refer to the defendant's prior armed robbery convictions during jury voir dire in order to blunt their effect on the jury at the penalty phase. " '[C]ounsel may reasonably treat the entire trial as a whole, and consider what effect a tactical decision at one phase will have on a later phase.' " (*People v. Freeman, supra,* 8 Cal.4th at p. 484, quoting *People v. Kelly* (1992) 1 Cal.4th 495, 522 [3 Cal.Rptr.2d 677, 822 P.2d 385]; *id.* at pp. 520-521 [counsel could reasonably believe that guilt phase admission of a confession might aid the defense at the penalty phase].)[20]

Finally, defendant contends the trial court's failure to give, sua sponte, a proper limiting instruction concerning the prior murder conviction violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. He additionally argues that counsel was prejudicially ineffective in not requesting a limiting instruction. These contentions are without merit.

The trial court gave two jury instructions relevant to defendant's contentions. First, the court instructed the jurors that *if* they were to find the defendant guilty of murder in the first degree, only then would they need to determine the truth of the five special circumstance allegations, including the

---

[20]We reject defendant's related assertion that counsel provided ineffective assistance by not protesting the inclusion of certain details in the prior murder conviction stipulation, e.g., the date and county location of the conviction, and the female victim's name. Those critical details ensured that the prosecution and the defense had reached a meeting of the minds regarding the subject matter of the stipulation. Defendant does not persuade us that omission of such details would have been appropriate.

prior murder conviction allegation.[21] The court followed up with a modified version of CALJIC No. 8.82, as follows: "In this case, it is alleged that the defendant has been previously convicted of murder in the first degree. The defendant in this case has admitted the truth of this special circumstance in the stipulation which I previously read to you earlier in this trial. In that stipulation, the defendant admitted that he was convicted of murder in the first degree of Barbara Griswold in the Pasadena branch of the Superior Court of the State of California in and for the County of Los Angeles on or about September 10th, 1985. [¶] Therefore, *if and only if you have found the defendant guilty of murder in the first degree*, you may consider that stipulation as conclusive proof of the allegation that defendant was previously convicted of murder in the first degree as charged in the Information." (Italics added.)

Defendant does not argue that the foregoing instructions were erroneous. He asserts, however, that the trial court was further obligated to instruct the jurors that they could not consider the stipulation for any purpose until they first found defendant guilty of the first degree murder of Mrs. Mar and that they could not rely on the prior murder conviction as evidence of guilt. We are not persuaded. Taken together, the instructions correctly and adequately informed the jurors that they could not consider the stipulation or the prior murder conviction unless and until they first found defendant guilty of the first degree murder of Mrs. Mar. The instructions were reasonably clear, and no more was required.[22]

Even assuming that the court's instructions presented a potential ambiguity, their correct import was reinforced to the jury by the prosecutor's exhortation during closing argument that the prior murder conviction "[s]hould have no part in your considerations with respect to his guilt of anything else until it's all resolved, and unless and until you find him guilty of murder in the first degree. [¶] And you will, I trust, when you look at the evidence clearly and rationally. Then and only then do you get to the point where you discuss the prior murder conviction special circumstance." Hence, the absence of a further limiting instruction could not have undermined

---

[21]The court instructed: "If you find the defendant in this case guilty of murder in the first degree, you must then determine if one or more of the following special circumstances are true or not true: [¶] Murder in the course of the commission of burglary, robbery, rape, and sodomy, and murder with the prior murder conviction."

[22]Contrary to defendant's assertions, this case bears no resemblance to *People v. Garceau* (1993) 6 Cal.4th 140, 186 [24 Cal.Rptr.2d 664, 862 P.2d 664], in which the trial court erred by advising the jurors that they could consider other-crimes evidence " 'for any purpose, including but not limited to' " the defendant's " 'character or any trait of his character.' " (Italics omitted; *id.* at pp. 185-187 [nonetheless concluding such error was harmless beyond a reasonable doubt].)

defendant's trial, and any perceived incompetence by counsel on the point was harmless.

In sum, defendant does not demonstrate that the trial court committed prejudicial error, that the waiver and the stipulation rendered his trial fundamentally unfair, that the jury instructions violated his federal constitutional rights, or that his trial counsel was prejudicially ineffective on these points.

### 3. *Evidentiary Matters*

Defendant contends the trial court erroneously allowed the prosecution to present much irrelevant evidence during the guilt phase. He argues that the jury's exposure to such inadmissible and unreliable negative evidence was prejudicial, rendered his trial fundamentally unfair (*Cooper v. Sowders* (6th Cir. 1988) 837 F.2d 284, 288), and denied him his federal constitutional right to heightened due process in a capital case (*Beck v. Alabama* (1980) 447 U.S. 625, 637-638 [100 S.Ct. 2382, 2389-2390, 65 L.Ed.2d 392]). We address each claim of error below.

#### a. *Consciousness of Guilt*

Correctional Sergeant Hess testified for the prosecution that defendant, while in prison in February of 1986, threatened to forcibly resist a court order for production of hair and blood samples. When Hess told defendant he could "make it easy on yourself" or could "make it rough," defendant said he would comply with the order under duress. The samples were taken from defendant without further incident. After Hess and another witness completed their testimony, the prosecutor called Detective Mellecker to the stand. Mellecker testified he had gone to the prison to execute a search warrant for defendant's hair and blood samples, and had been waiting in the prison medical office when defendant entered the office. When the prosecutor asked Mellecker what happened next, defense counsel objected on relevancy grounds. The court overruled the objection, and Mellecker's testimony on the subject was consistent with Hess's. During a break in the defense's cross-examination of Mellecker, counsel moved to strike Hess's testimony on the matter. That motion was overruled.

On appeal, defendant contends that admission of the challenged testimony was error under state law because: (1) it was irrelevant for the stated purpose; (2) it included unreliable opinion testimony of a lay witness; (3) it consisted of uncharged "bad act" testimony with no basis for admission under Evidence Code section 1101, subdivision (b); and (4) its admission violated Evidence Code section 352.

The People argue that defendant's failure to raise timely and specific objections to the admission of Hess's testimony in the trial court bars appellate review of his four claims. We agree. Defense counsel's relevancy objection during Mellecker's testimony was inadequate to preserve for appellate review the admissibility issues concerning Hess's preceding testimony on the same subject. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1122 [74 Cal.Rptr.2d 121, 954 P.2d 384] [a subsequent objection to admission of photographs is inadequate to preserve for review the issues of admissibility concerning a witness's preceding testimony and explanation of the photographs]; *id.* at p. 1130 [objection on relevancy grounds does not preserve a challenge under Evid. Code, § 352]; *People v. Dennis* (1998) 17 Cal.4th 468, 530 [71 Cal.Rptr.2d 680, 950 P.2d 1035] [objection that questions were leading does not preserve a challenge on hearsay grounds]; *People v. Zapien* (1993) 4 Cal.4th 929, 979-980 [17 Cal.Rptr.2d 122, 846 P.2d 704].) In any event, even if all claims had been preserved, we would conclude there was no error.

■■■ "[T]he refusal of a defendant to provide an exemplar in violation of a court order is admissible evidence of the defendant's consciousness of guilt." (*People v. Clark, supra,* 5 Cal.4th at p. 1003 [handwriting exemplar]; see also *People v. Manson* (1976) 61 Cal.App.3d 102, 149 [132 Cal.Rptr. 265] [same]; *People v. Johnson* (1992) 3 Cal.4th 1183, 1223, fn. 9 [14 Cal.Rptr.2d 702, 842 P.2d 1] [refusal to stand in a lineup].) Here, defendant concedes that evidence of his initial refusal to provide blood and hair samples despite a court order "could conceivably have been material" to show consciousness of guilt, but that would only be so, he argues, if the defense had put the matter at issue. That reasoning fails to persuade, for defendant did not concede guilt at the first phase of trial. The relevancy objection lacked merit, and the evidence was properly admitted.

■■■ Second, Correctional Sergeant Hess's testimony that defendant stood "in a posture like he was going to start fighting" did not constitute inadmissible opinion testimony of a lay witness. A lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of his testimony. (Evid. Code, § 800.) Here, Hess's opinion was based on his personal observations that defendant was being "very defiant" about the court order and physically stood with his hands at his side and left foot forward. On this record, we cannot say that Hess's testimony lacked a rational basis, or that it failed to clarify his testimony. Moreover, perceptions such as those formed by Hess are sufficiently within common experience, and certainly within the experience of a correctional sergeant like Hess who had 15 years of security experience at a prison hospital. The trial court acted well within its discretion in permitting

the lay opinion testimony. (See *People v. Medina* (1990) 51 Cal.3d 870, 887 [274 Cal.Rptr. 849, 799 P.2d 1282].)

Third, the prosecution did not offer the evidence regarding defendant's defiant conduct to establish his criminal propensity in violation of Evidence Code section 1101. Rather, the evidence was offered to show defendant's consciousness of guilt, and was properly admitted for that purpose. (See *People v. Clark, supra,* 5 Cal.4th at p. 1003.) To the extent defendant argues that impermissible inferences could also have been drawn from such evidence, he could have requested a proper limiting instruction to eliminate any perceived problem. (*People v. Macias* (1997) 16 Cal.4th 739, 746, fn. 3 [66 Cal.Rptr.2d 659, 941 P.2d 838] [absent a request, the trial court has no sua sponte duty to give a limiting instruction].) Again, no error appears.

Finally, we see no error with respect to Evidence Code section 352. As discussed, the evidence was relevant to establish defendant's consciousness of guilt. In the absence of a request, the trial court was not required to weigh the prejudicial value against the probative value of the evidence. In any event, the testimony describing defendant's initial defiance with respect to the court-ordered blood and hair samples did not suggest his actions were criminal or violent; indeed, Hess testified that defendant was never cited for any security or disciplinary violation as a result of the incident. Because the testimony was neither inflammatory nor misleading, its admission was proper under Evidence Code section 352. (See *People v. Barnett, supra,* 17 Cal.4th at pp. 1130-1131.)[23]

b. *Testimony Regarding a Series of Murders*

Detective Mellecker testified that, at the time of Mrs. Mar's murder in 1982, he was working on a series of murders involving lone elderly females in the area. Mellecker initially went to the crime scene to investigate the possibility of a connection between the Mar murder and the other murders he was investigating. Because "there was no similarity" to the other murders, Mellecker did not become involved in the Mar case at that time. Subsequently, for reasons unrelated to the other series of murders, Mellecker's

---

[23]To the extent defendant argues the trial court violated his due process by allowing the prosecutor to urge the jury to hold his assertion of a constitutional right against him, he is wrong. As relevant here, defendant's primary authority, *Bordenkircher v. Hayes* (1978) 434 U.S. 357, 363 [98 S.Ct. 663, 668, 54 L.Ed.2d 604], simply recognizes that "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." That principle fails to aid defendant here because, among other things, he fails to establish the lawfulness of his refusal to provide the court-ordered samples.

Finally, for all the reasons supporting our conclusion that none of defendant's claims on this guilt phase evidence is meritorious, we reject his related contention that such evidence tainted the penalty phase.

division was formally assigned to the Mar case in 1983, and Mellecker himself started actively investigating Mrs. Mar's murder in 1985.

On appeal, defendant complains the detective's testimony was irrelevant and left the jury with the erroneous and inflammatory impression that defendant may have been involved in serial murders of older women. He contends the trial court prejudicially erred by refusing to strike the testimony, refusing to instruct the jury to disregard the testimony, and refusing to grant his motion for a mistrial.

We first address whether defendant is procedurally barred from asserting these claims on appeal. As the People point out, Detective Mellecker initially referred to a series of murders involving lone, elderly females during his direct examination. The first two times he mentioned the subject, defendant did not object. The third time, when the prosecution asked Mellecker whether he decided to take the Mar case as part of his investigation of the other series of murders, defendant made only a relevancy objection. Thereafter, it was defense counsel who raised the topic during Mellecker's cross-examination. It was not until the prosecutor's redirect examination of Mellecker that defendant objected to the subject matter as being highly prejudicial and moved for a mistrial. The tardiness of defendant's objections, coupled with the defense's questioning on the same topic, arguably resulted in a forfeiture of the right to raise the admissibility contentions on appeal. (See *People v. Barnett, supra,* 17 Cal.4th at pp. 1122, 1130; see also *People v. Simon* (2001) 25 Cal.4th 1082, 1097, fn. 9 [108 Cal.Rptr.2d 385, 25 P.3d 598] [forfeiture is the failure to make the timely assertion of a right].) In any event, none of the contentions is meritorious.

 Although the circumstances of Mellecker's early involvement in the Mar case were not relevant to the issue of guilt, the trial court did not abuse its discretion in permitting Mellecker to clarify his official role for the jury's benefit.[24] Moreover, any prejudicial effect from the detective's reference to a series of other murders was minuscule. Not only did Mellecker clearly and repeatedly state that Mrs. Mar's murder was "entirely different than" and "not anywhere similar to" the other murders, but he explained he did not take responsibility of the Mar crime scene and investigation because "there was nothing at [the] scene to indicate that it was part of our other series." In denying defendant's mistrial motion, the trial court limited further testimony on the subject to evidence that was "unique" about the Mar murder, thus ensuring that no details of the unrelated murders would be solicited. On this

[24]For example, Randy Adair testified he was the lead detective at the crime scene, yet Mellecker indicated he had assumed the primary role in obtaining and executing the court order for the blood and hair samples.

record, admonishment of the jury was unnecessary and a mistrial unwarranted. Defendant's claims of error· are rejected.[25]

### c. *Knife Evidence*

In January of 1983, about two months after Mrs. Mar's homicide, police arrested defendant for reasons unrelated to the Mar case and found a knife in his possession. The prosecution sought permission to introduce that knife as evidence and to show it could have been the tool used to cut the telephone cords and the screen door at the Mar residence in November of 1982. Objecting on relevance, due process, and Evidence Code section 352 grounds, the defense argued that no connection between the knife and the crimes could be established and that its introduction would be highly prejudicial. The trial court overruled the objection. Criminalist William Lewellen then testified that, although his analyses of the items did not conclusively identify the knife with the cuts, they did indicate that the blade's length and shape were similar to the slit in the screen door and that the knife could have been used to cut the telephone cords.

▆▆ Defendant contends the trial court abused its discretion and denied him due process by admitting the knife and associated testimony into evidence. He claims the knife evidence was irrelevant to any disputed material issue because there was no showing as to when he acquired the knife. Improper introduction of the weapon, he argues, led jurors to infer that he murdered Mrs. Mar simply because he had a similar knife two months after the killing.

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.)

Evidence that defendant possessed a knife two months after the Mar crimes, coupled with the evidence that the perpetrator of the Mar crimes used a sharp instrument, consistent with defendant's knife, to slit a screen door and sever two telephone cords at the Mar residence, tended to establish that defendant was the perpetrator. "Standing alone the inference may have

---

[25]Defendant additionally contends that Mellecker's references to the murders of elderly women led to further prejudice by giving the four jurors who were involved in the purse-snatching incident more possible victims to identify with and a further emotional bias against defendant. Since the trial court had independently ascertained that the purse-snatching incident would not affect the jurors' ability to judge defendant's case fairly, and since Mellecker made clear that the Mar murder was not connected to the series of murders he was investigating, this contention is devoid of merit.

been weak, but that does not make the evidence irrelevant." (*People v. Freeman, supra,* 8 Cal.4th at p. 491 [rejecting argument that evidence of a garbage bag found in the defendant's car shortly after the subject robbery was irrelevant because no one identified it as the bag used to hold the robbery victims' property, and an " 'infinite' " number of people " 'must possess such common, unremarkable articles as plastic bags' " in their cars].) The fact that many persons may similarly have possessed such a knife "may diminish the strength of the evidence, but it does not make it irrelevant." (*Ibid.*)

It does not matter that the prosecution could not conclusively connect defendant's knife to the Mar crime scene. In *People v. De La Plane* (1979) 88 Cal.App.3d 223 [151 Cal.Rptr. 843], for instance, the trial court admitted evidence of a sawed-off axe handle found in the house in which the defendant was arrested. There, the only evidence that connected the axe handle to the murder victim was expert testimony concluding that the handle "*could* have caused" the victim's wounds. (*Id.* at p. 239.) As the appellate court aptly reasoned in that case, "If a victim's wound *could* have been caused by a specific type of weapon or instrument, such a weapon or instrument found in defendant's possession is admissible in evidence. Such a weapon or instrument is considered relevant on the theory that a trier of fact may reasonably draw an inference from defendant's possession of the weapon or instrument to the fact that he used the weapon or instrument to commit the offense—a disputed fact of consequence in the action." (*Ibid.*; see also *People v. Alcala* (1992) 4 Cal.4th 742, 796-797 [15 Cal.Rptr.2d 432, 842 P.2d 1192] [evidence of Kane Kut knives seized from defendant's residence properly admitted to show that defendant had access to, or familiarity with, the same brand of carving knife found near the murder victim's remains]; *People v. Clark* (1992) 3 Cal.4th 41, 129 [10 Cal.Rptr.2d 554, 833 P.2d 561] [evidence of two knives belonging to the defendant properly admitted at trial, even though neither knife was directly or conclusively connected to the offenses].)

Not only was the knife evidence relevant, but its admission was not error under Evidence Code section 352. In light of Lewellen's anticipated testimony, which proved consistent with his actual testimony, the court could reasonably conclude that the jury would not be confused or misled on the subject matter of the knife.[26] Thus, although the probative value of the knife was not that strong, the danger of confusion, speculation, or prejudice was minimal. We find no abuse of discretion and no deprivation of defendant's due process rights.

---

[26] On the stand, criminalist Lewellen additionally clarified that, in his opinion, any other sharp, single-bladed object, such as a scalpel, a kitchen knife, or part of a scissors blade, could also have cut the items.

### d. *Margaret Lee's Statements About the Red Scarf*

Mrs. Mar's daughter, Margaret Lee, testified for the prosecution that she had not ever seen her mother wearing scarves around the house, that she did not see her mother wearing a scarf on the night of the murder, and that the red scarf found around her mother's neck did not belong to her mother. On cross-examination, the defense sought to impeach Margaret's testimony by asking her if she had told Detective Adair, the day after the 1982 murder, that the red scarf belonged to and was worn by the victim the last time Margaret saw her. Thereafter, Detective Mellecker testified, over a defense hearsay objection, that Margaret told him in 1986 that her mother was not wearing a scarf when Margaret last saw her. The prosecution had offered Mellecker's testimony under the prior consistent statement rule.

Defendant contends Mellecker's testimony was not properly admitted as a prior consistent statement of Margaret Lee. The erroneous admission of such hearsay evidence, he argues, was prejudicial and rendered his trial fundamentally unfair and unreliable.

Evidence Code section 1236 authorizes the admission of hearsay if the statement is consistent with a witness's trial testimony and is offered in compliance with Evidence Code section 791. Evidence Code section 791, subdivision (b) allows a prior consistent statement if offered after "[a]n express or implied charge has been made that [the witness's] testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

Even assuming, for purposes of argument, that Mellecker's testimony did not fall within this hearsay exception, any error in admitting the testimony was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Margaret's out-of-court statement to Mellecker—i.e., that Mrs. Mar was not wearing a scarf when Margaret last saw her—merely corroborated other testimony at trial to the effect that none of Mrs. Mar's children ever told Detective Adair that their mother was wearing a red scarf on the night she was murdered. As the record discloses, Margaret testified she did not tell Adair that her mother was wearing a scarf on the night of November 19, 1982, and she emphasized that Adair would have been mistaken if he had gotten that impression from her. Consistent with Margaret's testimony, Adair testified that his police report notation concerning the scarf was a mistake, that he could not find any documentation in the family statements or in the police officers' statements

to support that notation, and that he had simply assumed the scarf belonged to Mrs. Mar. Furthermore, both Harry Mar and his wife, Patricia, testified at trial that they did not see Mrs. Mar wearing a scarf on the night of the murder. In light of all the properly admitted evidence on the point, the admission of Mellecker's hearsay testimony could not possibly have prejudiced defendant.

### e. *The Computerized Fingerprint Matching Program*

After an Evidence Code section 402 hearing, the trial court allowed the prosecution to present testimony from Samuel Erwin, Jr., concerning the Los Angeles Police Department's use of a computerized database for fingerprint matching (the CAL-ID system) that produced a list of candidates, which included defendant, whose fingerprints were similar to those found at the Mar crime scene. After the CAL-ID system initially identified defendant as a possible candidate for a match, a latent print analyst visually compared defendant's fingerprint card to the latent prints taken from the Mar crime scene and found that defendant's fingerprints appeared to match the latent prints. Erwin then confirmed that the prints matched. Defendant contends the introduction of the CAL-ID system evidence was erroneous because: (1) it was irrelevant, confusing, and cumulative (Evid. Code, § 352); and (2) it lacked the requisite scientific foundation (*People v. Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly*)). Additionally, he complains that an advertising brochure explaining the CAL-ID system should not have been shown to jurors because the brochure was unauthenticated.

Defendant's failure to object at trial on grounds of Evidence Code section 352 and lack of authentication procedurally bars him from asserting those contentions on appeal. (Evid. Code, § 353; *People v. Barnett, supra,* 17 Cal.4th at p. 1130.) In any event, even if all points were properly preserved, they lack merit.

Assuming, for purposes of argument, that Erwin's testimony concerning the computerized fingerprint matching program had little or no relevance, the testimony presented little, if any, potential for prejudice. Contrary to defendant's assertions, it was not "the type of evidence that might evoke prejudice" by "making it appear as though [defendant] was the subject of some unimpeachable computerized decision." Rather, Erwin's testimony clarified that the CAL-ID system did not actually make identifications and that it merely pointed police to candidates in the fingerprint database who come closest to matching a particular latent print. Once a candidate list was produced, he explained, it would remain necessary for a qualified expert to make a visual comparison to determine the existence of a match. Given the

clear import of such testimony, there was no potential for juror confusion, and the trial court did not abuse its discretion in admitting the evidence. Likewise, there could have been no harm arising from the admission of the CAL-ID advertising brochure.

 Defendant's contention based on *Kelly, supra,* 17 Cal.3d 24 fares no better. Under *Kelly,* "the proponent of evidence based on a 'new' scientific technique" must "establish its general acceptance within the relevant scientific community." (*People v. Pride* (1992) 3 Cal.4th 195, 238 [10 Cal.Rptr.2d 636, 833 P.2d 643]; see *People v. Ayala* (2000) 24 Cal.4th 243, 281 [99 Cal.Rptr.2d 532, 6 P.3d 193].) "This approach is intended to prevent lay jurors from being unduly influenced by procedures which seem scientific and infallible, but which actually are not." (*People v. Webb* (1993) 6 Cal.4th 494, 524 [24 Cal.Rptr.2d 779, 862 P.2d 779].) On the other hand, where "a procedure isolates physical evidence whose existence, appearance, nature, and meaning are obvious to the senses of a layperson, the reliability of the process in producing that result is equally apparent and need not be debated under the standards of *Kelly, supra,* 17 Cal.3d 24." (*Ibid.*)

We conclude that the admission of Erwin's testimony concerning the CAL-ID system did not implicate the concerns addressed in *Kelly.* The reliability of the computerized system in comparing latent prints to fingerprints in its database was apparent at trial. The jury could make its own comparisons between the latent prints found at the Mar crime scene and defendant's fingerprints, and there was no dispute that the system made its comparisons "without tampering or alteration of any kind." (*People v. Webb, supra,* 6 Cal.4th at p. 524.) Moreover, Erwin did not suggest that the CAL-ID system positively identified the latent prints as defendant's fingerprints, or that any opinion regarding a fingerprint identification was based on the computer. Although the police used the CAL-ID system to narrow the range of potential candidates whose fingerprints might match the latent prints, the prosecution relied on a long-established technique—fingerprint comparison performed by fingerprint experts—to show the jury that defendant's fingerprints matched those found at the Mar residence. Accordingly, the trial court did not err under *Kelly* when it admitted Erwin's testimony.[27]

 Finally, defendant asserts he was prejudiced by Erwin's explanation of the categories of persons included in the CAL-ID system database. In

___

[27]In light of our conclusion that *Kelly* was inapplicable to evidence regarding the CAL-ID system, we reject defendant's related contentions that Erwin was unqualified to testify about the system, that his testimony did not satisfy the *Kelly* requirements, and that his active involvement in procuring the system for the police department rendered him unable to provide fair and impartial scientific testimony on the subject.

defendant's view, Erwin's testimony that felons convicted of homicide, rape, robbery, and burglary were among those included in the database in effect disclosed his prior felon status to the jury and implied he had been previously convicted of those particular crimes.

Defendant failed to raise any objection to this testimony at trial. (Evid. Code, § 353; *People v. Zapien, supra,* 4 Cal.4th at pp. 979-980.) Even if preserved, however, the contention is without merit. Not only did Erwin make clear that the database also included nonfelons such as job applicants who required background clearance, but he did not purport to explain defendant's inclusion in the database, and he made no mention of past crimes defendant committed or was alleged to have committed. In any event, since defendant stipulated to informing the jury, during the guilt phase, of his prior murder conviction, no prejudice could possibly have resulted from a suggestion that his fingerprints may have been included in a database comprised of felony offenders.

### f. *Testimony of Criminalist Keith Inman*

Based on his review of photographs showing blood drips, drops, and spatters on the victim and at the crime scene, and other evidence as well, criminalist Keith Inman offered the following conclusions regarding the sequence of events leading to Mrs. Mar's death. The blood drops on Mrs. Mar's pants and panty indicated that Mrs. Mar suffered trauma to her head, resulting in bleeding, after those clothes were pulled off her body. The trauma was inflicted in the bedroom, near her bed, but the absence of contact stains on the bedspread indicated that while her head was bleeding it did not come into contact with the bed. The presence of semen on the bedspread and the bedroom carpet indicated that the sexual assault occurred most likely on the edge of the bed, but it was impossible to tell whether ejaculation occurred before or after penetration. That is, there could have been intercourse with ejaculation and then leakage of semen out of the vagina or the rectum onto the bedspread and the carpet, or alternatively, there could have been an ejaculation via masturbation with intercourse after that. Bloodstains on both sides and at the very bottom of the bedspread indicated there was movement all along the foot of the bed, and then Mrs. Mar moved or was moved out into the hallway. Blood spatters on the hallway wall indicated that force was applied to Mrs. Mar one or more times in the hallway, at a time when she was not on the floor. It appeared likely that she was strangled in the hallway where her body was found. It also appeared that the attack on Mrs. Mar was continuous and that all the events occurred within a short period of time, perhaps 10 to 20 minutes.

On appeal, defendant contends that Inman was not qualified to render an expert opinion on blood spatters (Evid. Code, § 720) and that therefore his

conclusions as to the sequence of events were conjectural and speculative. At trial, defense counsel objected to Inman's blood spatter testimony as assuming facts not in evidence, speculative, and conclusory. But counsel affirmatively stated they had no objection if Inman were to "reconstruct the way the crime may have occurred" and did not challenge Inman's qualifications to provide expert opinion on blood spatters. At most, counsel objected to Inman's qualifications with respect to estimating the amount of time elapsing from the start to the finish of the attack on the victim. Consequently, defendant's challenges to Inman's testimony regarding blood spatters and crime scene reconstruction have been forfeited. (Evid. Code, § 353; *People v. Bolin* (1998) 18 Cal.4th 297, 321 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

In any case, defendant's contentions lack merit. Error regarding a witness's qualifications as an expert will be found only if the evidence shows that the witness " ' "*clearly lacks* qualification as an expert." ' " (*People v. Chavez* (1985) 39 Cal.3d 823, 828 [218 Cal.Rptr. 49, 705 P.2d 372].) Here, the record does not reflect that Inman, a criminalist with 10 years of experience, clearly lacked qualifications to offer opinions on blood spatters. Inman's work as a criminalist involved the examination of serological evidence, as well as crime scene reconstruction "by examining the totality of the physical evidence." He had earned a bachelor of science degree and a master's degree in criminalistics from the University of California at Berkeley, and had worked for three different law enforcement crime laboratories. He had examined evidence in 250 to 300 homicide cases and had worked on over 300 sexual assault cases. As a member of the California Association of Criminalists and the American Academy of Forensic Sciences, Inman had presented a number of technical papers to his peers. This record, made with no challenge to Inman's qualifications, does not demonstrate error. Moreover, the case here is amply distinguishable from *People v. Hogan* (1982) 31 Cal.3d 815 [183 Cal.Rptr. 817, 647 P.2d 93], which found that a trial court had erroneously permitted a criminalist to offer blood spatter testimony where the criminalist had merely observed many bloodstains without any inquiry, analysis, or experiment. (See *id.* at pp. 852-853.)

Moreover, it was not improper for Inman to testify about the sequence of events, even if he stated at one point that "common sense" supported the conclusion that Mrs. Mar was strangled where her body was found. Expert opinion on crime scene reconstruction generally is admissible (see, e.g., *People v. Bolin, supra,* 18 Cal.4th at pp. 321-322; *People v. Samayoa* (1997) 15 Cal.4th 795, 839-841 [64 Cal.Rptr.2d 400, 938 P.2d 2]; *People v. Howard, supra,* 1 Cal.4th at p. 1151), and " '[t]he jury need not be wholly

ignorant of the subject matter of the opinion in order to justify its admission' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 [283 Cal.Rptr. 382, 812 P.2d 563]). Here, we cannot say that Inman's testimony would not have assisted the jury (Evid. Code, § 801, subd. (a)) or that " 'it would add nothing at all to the jury's common fund of information' " (*People v. McAlpin, supra,* 53 Cal.3d at p. 1300).

### 4. *Instructional Error*

We have already considered and rejected defendant's claim that the trial court erroneously failed to give, sua sponte, a proper limiting instruction concerning his prior murder conviction stipulation. (*Ante,* pt. II.B.2., at p. 145.) We now consider his other claims of instructional error at the guilt phase.

#### a. *Failure to Limit Bad Character Evidence*

Defendant argues the trial court erred in failing to properly limit the jury's consideration of bad character evidence showing: (1) defendant's defiant refusal to provide court-ordered blood and hair samples; (2) his possession of a knife two months after Mrs. Mar's murder; (3) his inclusion in a fingerprint database consisting in part of felons who had committed homicide, rape, burglary, or robbery; and (4) his alleged connection with a "series of murders." Defendant contends he was denied a fair trial because the guilt verdict was impermissibly based on the foregoing evidence.

While evidence of a person's character generally "is inadmissible when offered to prove his or her conduct on a specified occasion" (Evid. Code, § 1101, subd. (a)), none of the aforementioned evidence reflected a character trait, and none was offered to prove defendant's conduct on a specified occasion. As already discussed, the knife evidence was properly admitted to show that defendant possessed a knife that could have been used to cut Mrs. Mar's screen door and telephone cords, while the evidence of his defiance was relevant to show consciousness of guilt. (See Evid. Code, § 1101, subd. (b).) As also discussed, the testimony explaining the felony-offender fingerprint database and the reference to an unrelated series of murders were not erroneously admitted and could not possibly have prejudiced defendant.

In any event, the trial court had no sua sponte duty to give a limiting instruction for such evidence. (See *People v. Padilla* (1995) 11 Cal.4th 891, 950 [47 Cal.Rptr.2d 426, 906 P.2d 388]; *People v. Morris* (1991) 53 Cal.3d 152, 214 [279 Cal.Rptr. 720, 807 P.2d 949].) This was not an "extraordinary case" in which the unprotested evidence was "*both* highly prejudicial *and* minimally relevant to any legitimate purpose," *and* was "a

dominant part of the evidence against the accused." (*People v. Collie* (1981) 30 Cal.3d 43, 64 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776], italics added [articulating a hypothetical exception to the rule generally rejecting a sua sponte duty].) Even assuming that some of the evidence at issue was only minimally relevant or not relevant at all, none of the evidence constituted a "dominant" part of the case, given the strength of the fingerprint, serological, and hair evidence against defendant. Nor was such evidence inflammatory or otherwise highly prejudicial. The claim is rejected.

### b. *Consciousness of Guilt*

Pointing to the evidence of defendant's initial threat to forcibly resist the court order for hair and blood samples, the prosecution requested a jury instruction regarding consciousness of guilt based on a modified version of CALJIC No. 2.06. The defense objected on the grounds that there was insufficient evidence to warrant the instruction and that it permitted the jury to draw an adverse inference from an innocent act, i.e., defendant's assertion of a perceived constitutional right. The trial court overruled the objection and gave the requested instruction.[28]

Defendant contends the modified instruction impermissibly incorporated a permissive presumption not supported by the evidence. That is, he appears to argue there was insufficient evidence indicating that his reasons for initially refusing to provide Detective Mellecker with blood and hair samples had anything to do with the Mar case. We disagree. Sufficient evidence supported the instruction in light of Mellecker's previous meeting with defendant in prison a month prior to defendant's act of refusal. At that previous meeting, Mellecker questioned defendant about the discovery of his fingerprints at an unidentified crime scene, and he gave defendant a card indicating he was a homicide/robbery detective. When Mellecker returned to the prison with the court order, defendant became nervous and apprehensive and initially refused to provide the samples until a prison security officer intervened. The jury could reasonably infer from the foregoing evidence that defendant attempted to suppress evidence that might incriminate him in Mrs. Mar's murder. To the extent other evidence in the record might have supported innocent explanations for defendant's conduct (e.g., he was concerned about the pending appeal of his prior murder conviction), that was a matter properly left for argument and for determination by the jury.

---

[28]The trial court instructed as follows: "If you find that a defendant attempted to suppress evidence against himself in any manner such as by concealing evidence in his attempt to refuse to comply with the court order requiring his blood and hair samples, such attempts may be considered by you as a circumstance tending to show a consciousness of guilt. However, such evidence is not sufficient in itself to prove guilt and it's [*sic*] weight and significance, if any, are matters for your consideration."

Defendant next claims the instruction improperly invited the jury to penalize him for mistakenly asserting his rights "as he believed them to be." This claim is premised on evidence that defendant refused to provide the blood and hair samples on the stated basis that it was "a violation of [his] rights." Because defendant fails to establish that his refusal was protected by law, we cannot conclude that the challenged instruction was in error or that it violated constitutional prohibitions. (See *People v. Roberts* (1992) 2 Cal.4th 271, 311 [6 Cal.Rptr.2d 276, 826 P.2d 274].)

Defendant additionally argues that the instruction constituted a prejudicially erroneous pinpoint instruction because it specifically referred to the evidence that he attempted to refuse to comply with the court order requiring his blood and hair samples. Since defendant failed to raise this particular claim in the trial court, he has forfeited appellate review of the issue. (*People v. Bolin, supra*, 18 Cal.4th at p. 326 [failure to object to proposed wording of instruction bars claim on appeal].) ▉ In any event, we have rejected similar claims in the past, finding that CALJIC No. 2.06 benefits the defense by "ma[king] clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior." (*People v. Jackson, supra*, 13 Cal.4th at p. 1224; see also *People v. Johnson, supra*, 3 Cal.4th at p. 1235.) Moreover, the modified instruction given here is virtually indistinguishable from the one found proper in *People v. Johnson, supra*, 3 Cal.4th 1183. In that case, the consciousness of guilt instruction specifically referred to the defendant's refusal to participate in a lineup. (See *id.* at pp. 1235-1236.)

Finally, defendant contends the instruction violated his Sixth Amendment right to a fair trial and an Eighth Amendment right to jury instructions that do not impermissibly restrict a jury's consideration of relevant evidence. These contentions have not been preserved for review, because they were not raised below. In any event, defendant fails to establish that the Sixth and Eighth Amendments to the federal Constitution would justify a different result with respect to the challenged instruction.

### c. *Preservation of Evidence*

Defendant contends the state's failure to preserve biological evidence collected from the victim's body and home denied him due process, a fair trial, and the right to reliable guilt and penalty determinations. Specifically, defendant claims that the state's failure to properly refrigerate or freeze carpet samples, sexual assault kit evidence, blood and semen samples, and

the victim's bedspread resulted in the degradation of material exculpatory evidence. Moreover, he claims, the trial court erroneously denied a defense request for a jury instruction on the matter[29] and a motion for a new trial on the same ground.

 " 'Law enforcement agencies have a duty, under the due process clause of the Fourteenth Amendment, to preserve evidence "that might be expected to play a significant role in the suspect's defense." (*California v. Trombetta* (1984) 467 U.S. 479, 488 [104 S.Ct. 2528, 2535, 81 L.Ed.2d 413]; accord, *People v. Beeler* (1995) 9 Cal.4th 953, 976 [39 Cal.Rptr.2d 607, 891 P.2d 153].) To fall within the scope of this duty, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." [Citations.] The state's responsibility is further limited when the defendant's challenge is to "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." (*Arizona v. Youngblood* (1988) 488 U.S. 51, 57 [109 S.Ct. 333, 337, 102 L.Ed.2d 281].) In such case, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Id.* at p. 58 [109 S.Ct. at p. 337]; accord, *People v. Beeler, supra,* 9 Cal.4th at p. 976.)' [Citation.]" (*People v. Catlin, supra,* 26 Cal.4th at pp. 159-160.)

Defendant's claims are devoid of merit. Here, the crux of his complaint is that the state failed to properly "preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." (*Arizona v. Youngblood, supra,* 488 U.S. at p. 57 [109 S.Ct. at pp. 337-338].) Accordingly, to prevail on his claims defendant must show bad faith on the part of the state. (*Id.* at p. 58 [109 S.Ct. at p. 337].) He does not do so. At the time the samples were taken in 1982, the police had no suspects in the Mar crimes, and the police crime laboratory did not routinely refrigerate samples other than those in sexual assault kits. Freezers were not even available in the police department's property division until the end of 1983. Defendant does not contend that the prosecution withheld any evidence or reports pertaining to the sexual assault kit or any other evidence gathered from the crime scene. Because the record

---

[29]The proposed instruction read: "While in the possession of law enforcement, the following items of evidence were either not suitably refrigerated or frozen: carpet samples, sexual assault kit evidence, and semen and/or blood samples. [¶] You must take the failure to preserve this evidence as indicating that among the inferences which may reasonably have been drawn from this evidence, those inferences most favorable to the defendant are the more probable."

fails to reflect any bad faith on the part of the state, the inaction complained of did not result in any due process violation. (*Ibid.*) Accordingly, the trial court committed no error in refusing defendant's instructional sanction or in determining that a new trial was not necessary.

Finally, consistent with our conclusion that the state breached no duty to defendant in failing to freeze or refrigerate evidence, we reject defendant's related contention that trial counsel was ineffective for failing to request and secure suppression of any testimony by the prosecution experts who examined the evidence.

### 5. *Prosecutorial Misconduct*

Defendant contends that the prosecutor committed multiple acts of prejudicial misconduct during the guilt phase by engaging in inflammatory argument, misstating the evidence, misleading the jury, and expressing her personal opinions regarding witness testimony and defendant's guilt.

 " 'Improper remarks by a prosecutor can " 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [106 S.Ct. 2464, 2471, 91 L.Ed.2d 144]; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 642 [94 S.Ct. 1868, 1871, 40 L.Ed.2d 431]; cf. *People v. Hill* (1998) 17 Cal.4th 800, 819 [72 Cal.Rptr.2d 656, 952 P.2d 673].)' [Citation.] 'But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' (*People v. Espinoza* (1992) 3 Cal.4th 806, 820 [12 Cal.Rptr.2d 682, 838 P.2d 204]; *People v. Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610].) 'To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have otherwise cured the harm caused by the misconduct.' [Citations.]" (*People v. Earp, supra,* 20 Cal.4th at p. 858.)

Here, any conceivable harm resulting from the instances of alleged misconduct could have been cured by an admonition. Therefore, defendant's failure to make timely objections and requests for admonishment bars him from now challenging many of the prosecutor's comments he identifies on appeal. In any case, upon consideration of all the comments at issue, whether objected to or not, we find no prejudicial misconduct for the reasons below.

 Defendant asserts the prosecutor used her opening statement to appeal improperly to the jurors' emotions by repeatedly referring to the

victim as a widow and mother, by remarking that the victim was murdered on the birthday of her daughter, Margaret, and by noting that the victim's son, Harry, was involved with a children's group at his church. Also, the prosecutor referred to defendant as "monstrous," "cold-blooded," vicious, and a "predator," and called the evidence "horrifying" and "more horrifying than your worst nightmare."

"The purpose of the opening statement is to inform the jury of the evidence the prosecution intends to present. . . ." (*People v. Millwee* (1998) 18 Cal.4th 96, 137 [74 Cal.Rptr.2d 418, 954 P.2d 990].) "Nothing prevents the statement from being presented in a story-like manner that holds the attention of lay jurors and ties the facts and governing law together in an understandable way. Although it is generally improper to ask jurors to step into the victim's shoes and imagine his or her suffering [citation], the prosecutor is not prohibited from identifying traits that made the victim particularly vulnerable to attack where such facts bear on the charged crimes and are not otherwise inadmissible on their face. [Citation.]" (*Ibid.*)

The prosecutor here did not violate due process principles or state law. The fact that the victim was a widow was relevant to inform the jury of the victim's identity and to limit the number of persons who could be the source of the loose hair and the semen recovered from the victim's body and her bedroom. That the murder occurred on Margaret's birthday and that Harry was involved with a children's group were relevant to explain where those witnesses were after leaving their mother's apartment on the evening of the murder.[30] These references accurately forecast the evidence admitted in the prosecution's case-in-chief. No misconduct appears.

Additionally, there was nothing inappropriate about the prosecutor's use of epithets in describing defendant's actions, or her characterization of the evidence as "horrifying" and "more horrifying than your worst nightmare." Prosecutors "are allowed a wide range of descriptive comment and the use of epithets which are reasonably warranted by the evidence" (*People v. Terry* (1962) 57 Cal.2d 538, 561 [21 Cal.Rptr. 185, 370 P.2d 985]), as long as the comments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury (*People v. Sanders* (1995) 11 Cal.4th 475, 527 [46 Cal.Rptr.2d 751, 905 P.2d 420]). Here, the prosecutor's statements were no more than fair comment on what she anticipated the evidence would show. In light of the record, the comments were neither deceptive nor reprehensible. (*People v. Earp, supra,* 20 Cal.4th at p. 858.) Nor were they so unfair as to deny defendant due process. (*Darden v. Wainwright, supra,* 477 U.S. at p. 181 [106 S.Ct. at pp. 2471-2472].)

---

[30]Margaret left the apartment after curling her mother's hair to celebrate her birthday with her husband. Harry left to help with a children's function at his church.

██ Defendant contends that prejudicial misconduct occurred when the prosecutor asked Detective Mellecker on direct examination whether Mrs. Mar's murder was being investigated as part of a "series of murders" of elderly women. We disagree. As discussed (*ante*, pt. II.B.3.b., at p. 154), testimony on this point was both relevant and admissible to provide background regarding Mellecker's involvement in the case. Moreover, any possible prejudicial impact of the testimony was dispelled by Mellecker's repeated testimony that the Mar murder appeared unrelated and completely dissimilar to the other murders under his investigation.

Defendant next argues that the prosecutor committed prejudicial misconduct during her closing argument by: (1) improperly commenting on his prior murder conviction; (2) misstating evidentiary facts and misleading the jury as to proper inferences; (3) vouching for witnesses and expressing personal opinions on ultimate questions; and (4) insinuating that the defense had been fabricated. As set forth below, we find no merit to any of these claims.

Defendant asserts that the prosecutor violated an understanding between the court and the parties that facts underlying the prior murder conviction would not be presented to the jury at the guilt phase. No violation appears. As the record discloses, the defense stipulated to the truth of the prior murder conviction allegation with the expectation that the facts of the prior murder would be kept out of the guilt phase. That expectation was fulfilled. Those few times that the prosecutor referred to the prior conviction, she noted primarily those facts that had been read to the jury as part of the stipulation. (See *ante*, fn. 18.) Although the prosecutor did mention other facts not reflected in the stipulation (i.e., Griswold was murdered on March 5, 1981; defendant was convicted by a jury; and defendant went to Folsom State Prison after the conviction), she refrained from addressing the evidence about the prior murder itself. Contrary to defendant's assertions, the prosecutor was not guilty of misconduct.

Defendant also claims that the prosecutor misstated evidentiary facts and misled the jury on whether the Mar killing was premeditated and deliberate. The law on this issue is settled. "Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial." (*People v. Dennis, supra*, 17 Cal.4th at p. 522.) "Whether the inferences the prosecutor draws are reasonable is for the jury to decide." (*Ibid.*)

Here, the evidence showed, among other things, that before the attack, Mrs. Mar had telephoned a friend and was on the telephone for nearly an hour. The victim's children testified that their mother would use the telephone in the living room downstairs for lengthy calls, and that the victim

often left the living room screen door open and habitually left the curtains to that door partially open. The interior of the living room was visible from street level. The rooms downstairs, which contained entertainment equipment and envelopes of cash, were relatively undisturbed despite the intruder's entry through the living room screen door. Both telephone cords had been cut, and the victim had been attacked on the upstairs level of the residence. On this record, we cannot say that the prosecutor acted improperly in presenting her theory of premeditation and deliberation by arguing that defendant, from the street, watched the victim through open curtains in her living room and waited for an opportune time to enter the residence to commit a planned sexual attack and murder. (See *People v. Pinholster* (1992) 1 Cal.4th 865, 948 [4 Cal.Rptr.2d 765, 824 P.2d 571] [referring to matters outside the record clearly is prosecutorial misconduct].) The argument was neither deceptive nor reprehensible. (*People v. Earp, supra,* 20 Cal.4th at p. 858.)

Defendant next claims that the prosecutor improperly vouched for criminalist Keith Inman's opinion regarding the sequence of events during the assault and murder when she argued to the jurors, "*I think* the reasonable inferences are from all of the evidence that after [the victim] was murdered, [defendant] stepped over the body and went and committed the ransacking that you can see in People's [exhibit] 13." He also claims the prosecutor improperly vouched for Detective Randy Adair's observation of body indentations on the victim's bed, even though indentations could not be seen in photographs of the bed, by arguing that Adair "told you he put it in his 60-day report way back in 1983. I saw this and this looked real significant to me. And of course he was right." Defendant additionally complains about the prosecutor's comments that the prosecution witnesses are "the ones that know what's going on. [¶] . . . And you know it's true, too." In these latter comments, the prosecutor was addressing a discrepancy between Margaret Lee's testimony regarding the scarf found around the victim's neck and a police report that referenced witness statements on the topic.

This claim is utterly without merit. The prosecutor's statements constituted proper comments on the evidence, not attempts to vouch personally for the credibility of these witnesses. (Cf. *People v. Gates* (1987) 43 Cal.3d 1168, 1187 [240 Cal.Rptr. 666, 743 P.2d 301].) Read in context, the challenged comments urged the jury to credit the witnesses' testimony based on matters within the record, not matters within the prosecutor's own personal knowledge. (See *People v. Ochoa* (2001) 26 Cal.4th 398, 443 [110 Cal.Rptr.2d 324, 28 P.3d 78].)

Defendant contends that the prosecutor improperly disparaged Dr. Ryan, a defense pathologist, by insinuating he had lied for a price. He also claims

that the prosecutor improperly argued: "I couldn't believe this Dr. Ryan tried to tell us that our eyes couldn't see what they plainly saw" and "[i]t's unimaginable to me." Again, no misconduct appears.

■ "It is within the bounds of proper argument to attack the credibility of defense expert witnesses, and the weight to be given their testimony, based on the witnesses' compensation and the fact of their employment." (*People v. Babbitt* (1988) 45 Cal.3d 660, 702 [248 Cal.Rptr. 69, 755 P.2d 253].) Here, the insinuation complained of was based largely on words spoken by Dr. Ryan himself.[31] Moreover, the cited comments, when read in context, make clear that the prosecutor was arguing points and drawing evidentiary inferences at odds with Ryan's views of the evidence. The record does not show that she misstated the facts or went beyond the evidence in doing so.

Defendant claims the prosecutor improperly implied during rebuttal argument that his trial counsel knew he was guilty and were fabricating a defense which they themselves disbelieved. The prosecutor, he asserts, insinuated that counsel had attempted to mislead the jury by making up stories about suppressed evidence and representing DNA evidence in a way they knew was unsupported. These contentions lack merit. As the record discloses, the prosecutor pointedly remarked that defense counsel had "a difficult case to argue," given the prosecution's strong evidence against defendant. Although she contended that counsel's DNA and suppressed evidence arguments were not supported by the record, she did so without impugning defense counsel's honesty and integrity. Such arguments clearly were appropriate. (See *People v. Bemore* (2000) 22 Cal.4th 809, 846 [94 Cal.Rptr.2d 840, 996 P.2d 1152] ["prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account"]; cf. *People v. Bain* (1971) 5 Cal.3d 839, 847 [97 Cal.Rptr. 684, 489 P.2d 564] [an unsupported implication that defense counsel fabricated a defense constitutes misconduct].)

Finally, defendant asserts the prosecutor committed misconduct by engaging in ex parte communications with the jurors just after the purse-snatching incident involving Violet J. and three other jurors. We disagree.

During the guilt phase, defense counsel had moved for a mistrial based on their perception that the prosecutor had approached the jurors after the purse snatching in order to commiserate with them. The trial court questioned the

---

[31]Quoting from a portion of the trial transcript, the prosecutor argued: "But I think we can sum up [Dr. Ryan] in the following exchange on cross-examination in questioning the doctor towards the end. I said: 'Sir, I'm not going to take much more of your time.' His answer: 'I get paid for it, that's all right, talk slow.' "

four jurors and heard from the prosecutor about the incident, and ultimately determined that no deliberate ex parte contact or misconduct occurred. We find that sufficient evidence supports that determination, and see no basis for overturning it. Contrary to defendant's assertion, the situation here is nothing like that presented in *In re Possino* (1984) 37 Cal.3d 163 [207 Cal.Rptr. 543, 689 P.2d 115], a case in which an attorney was disciplined for, among other things, approaching a juror in his own pending criminal trial on drug charges, conversing with that juror about the prosecutor in his case and his own religious beliefs, and buying drinks for the juror and her companions. (*Id.* at pp. 167, 170 [record amply supported the trial court's conclusion that the attorney attempted to influence the juror and arouse sympathy on his behalf].)

In sum, we conclude that none of the challenged statements or conduct amounted to prejudicial prosecutorial misconduct, and none deprived defendant of due process or rendered his trial fundamentally unfair.

6. *Ineffective Assistance of Counsel*

Defendant contends he was denied effective assistance at the guilt phase by a number of counsel's actions or omissions. In addition to the ineffective assistance claims addressed earlier in this opinion, defendant argues that counsel were ineffective because: (1) they should have moved for a separate penalty jury; (2) they untimely objected to the state's failure to preserve potentially exculpatory serological evidence; (3) they should have objected to Correctional Sergeant Hess's testimony disclosing that defendant was in state prison when contacted for blood and hair samples and to Samuel Erwin's testimony indicating that defendant's fingerprints were included in a database of felons with offenses similar to those charged against him; (4) they failed to request a standard limiting instruction (CALJIC No. 2.50), or any other judicial admonition, to counter the evidence of defendant's defiant refusal to provide samples, the "series of murders" comment, and the evidence that defendant possessed a knife at the time of his arrest in 1983; and (5) they should have objected to all alleged instances of prosecutorial misconduct.

Defendant first argues that "counsel's concern about the jurors somehow wondering why they were not told of the conviction in the guilt phase would have been removed through use of a different penalty panel." Defendant, however, fails to show that the circumstances facing the defense constituted the requisite "good cause" for a separate penalty jury. (§ 190.4, subd. (c); see *People v. Pride, supra,* 3 Cal.4th at p. 252 [danger that the jury might blame the defense for failing to disclose prior violent crimes and prior felony

conviction at the guilt phase does not require separate juries].) Counsel cannot be faulted for failing to make a doomed motion.

The balance of defendant's claims fares no better. As discussed, defendant fails to establish any breach of a duty to preserve potentially exculpatory serological evidence. (*Ante*, pt. II.B.4.c., at p. 165.) Accordingly, defendant cannot establish that the alleged omissions of counsel on this point amounted to incompetent assistance, prejudicial or otherwise.

Additionally, defendant fails to establish any prejudice resulting from counsel's alleged omissions with respect to Hess and Erwin. Significantly, an integral part of the defense strategy was to have defendant's prior murder conviction stipulation read to the jury during the guilt phase. Given the information contained in that stipulation (see *ante*, fn. 18), the jury would not have been surprised to learn that defendant was in prison in 1985, or that his fingerprints may have been included in the felony-offender database. Since the trial court adequately instructed the jury with respect to its consideration of defendant's stipulation (*ante*, pt. II.B.2., at p. 145), and the testimony in question was not inflammatory (*ante*, pts. II.B.3.a., at p. 152, II.B.3.e., at p. 159), there is no reasonable probability that the result of the proceedings would have been different had counsel lodged timely objections.

Defendant's claim that counsel negligently failed to request an instruction to limit the jury's consideration of "other crimes evidence" also fails. To begin with, the three evidentiary matters at issue did not involve crimes previously committed by defendant, so CALJIC No. 2.50 was inapplicable. In any event, the three matters were properly admitted and involved little, if any, potential for improper use by the jury. (*Ante*, pts. II.B.3.a., at p. 152 [refusal to provide blood and hair samples], II.B.3.b., at p. 154 ["series of murders" comment], II.B.3.c., at p. 156 [knife evidence].) Accordingly, the possibility that such an instruction, or a similar instruction, had it been requested and given, "would have led to a result more favorable to defendant is not reasonably probable, 'since the likelihood of the jury's using the evidence for an improper purpose was so minimal under the facts of this case that any conceivable error was harmless.' " (*People v. Padilla, supra*, 11 Cal.4th at p. 951, quoting *People v. Bunyard* (1988) 45 Cal.3d 1189, 1226 [249 Cal.Rptr. 71, 756 P.2d 795].)

Finally, we have already determined that the prosecutor committed no misconduct. (*Ante*, pt. II.B.5., at p. 167.) Consequently, there can be no ineffective assistance due to defense counsel's failures to object. (*People v. Cunningham, supra*, 25 Cal.4th at p. 1038.)

### 7. *Effect of Alleged Guilt Phase Errors*

Defendant claims there were numerous serious and prejudicial errors that, even if deemed harmless separately, in combination resulted in an unfair trial and a denial of due process in violation of the state and federal Constitutions. Not so. Whether considered separately or in combination, the few errors that may have occurred during defendant's trial, as discussed earlier, were harmless.

### C. *Penalty Phase Issues*

### 1. *Evidence Relating to the McCarthy and Griswold Incidents*

The trial court permitted the prosecutor to present evidence of four incidents, including the Griswold murder and the attempted burglary involving Beverly McCarthy, to show that defendant previously engaged in criminal activity involving the use or attempted use of force or violence, or the express or implied threat to use force or violence.[32] (§ 190.3, factor (b).)

Defendant challenges the admission and use of facts surrounding the Griswold murder and the McCarthy burglary attempt on three grounds. First, the prosecutor violated section 190.3 and his due process rights by giving inadequate notice of the incidents. Second, because the McCarthy incident did not involve a violent offense, it was in any event inadmissible. Third, relitigation of the Griswold and McCarthy incidents in this case violated the constitutional bars against double jeopardy. We address these arguments in sequence.

#### a. *Notice*

As relevant here, section 190.3, fourth paragraph, provides that "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." The purpose of this provision is to advise an accused of the evidence against him so that he may have a reasonable opportunity to prepare a defense at the penalty trial.

Although the prosecutor gave notice to defendant well before the start of trial that the Griswold and McCarthy incidents would be presented as

---

[32]Because defendant was not convicted of the Griswold murder and the McCarthy burglary attempt until after he murdered Mrs. Mar, they were not admissible as prior convictions (§ 190.3, factor (c)), but only as criminal activity involving the use of force or violence (*id.*, factor (b)).

circumstances in aggravation, defendant claims the notice did not adequately inform him that sodomy (in the Griswold matter) and an attempted sexual assault (in the McCarthy incident) would be at issue. Defendant, however, did not raise the issue of inadequate notice at trial. Nor did he object when the prosecutor referred to such matters at trial. His failure to do so forfeits appellate review of this issue. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1153 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People v. Pinholster, supra,* 1 Cal.4th at p. 956.)

Even assuming the claim was preserved, it is without merit. " 'Notice that evidence will be presented regarding a specific prior crime or crimes should alert counsel that evidence of all crimes committed as part of the same course of conduct may be offered, and, therefore, substantially complies with the notice requirement of section 190.3.' " (*People v. Hart* (1999) 20 Cal.4th 546, 639 [85 Cal.Rptr.2d 132, 976 P.2d 683].) Here, the prosecutor filed two pretrial notices that "[a]ll evidence pertaining to the homicide of Barbara Griswold for which defendant suffered a conviction for murder in the first degree on September 10, 1985, in the Pasadena Superior Court in Case Number A564216" and that "[t]he burglary, rape and murder of Barbara Griswold" would be at issue. These notices were sufficient to alert counsel that any rape or otherwise unlawful sex act performed on Griswold at the time of the identified burglary and murder would be introduced at trial. (*Ibid.; People v. Pride, supra,* 3 Cal.4th at p. 259.) In view of this conclusion, we find no merit to defendant's related contentions that the prosecutor committed misconduct in serving the notice and in focusing on evidence of sodomy during her closing argument.[33]

As for the other incident, the prosecutor never sought to introduce any direct evidence in aggravation that defendant intended to attack McCarthy in a sexual manner. Accordingly, the prosecutor's written pretrial notice referring to "the attempted burglary of Beverly McCarthy and [her son] Eric Wilson committed by the defendant on January 22, 1983" clearly satisfied the statutory notice requirement for what she did introduce. Although defendant evidently complains that the prosecutor impermissibly suggested to the jury that a sexual attack might have happened had defendant actually gotten into the hotel room alone with McCarthy, that argument, to which defendant did not object, was brief and constituted a reasonably fair comment in light of the evidence pertaining to the Mar and Griswold crimes.

In any event, any perceived inadequacy in the prosecution's notice must be deemed harmless. The record discloses no indication that the defense

[33]The evidence at trial included the testimony of Dr. Cogan, a deputy medical examiner, that the victim's anus was "dilated or widened" and that a small area of hemorrhage in the mucosa around the opening indicated "some type of sodomy."

needed more time to prepare a response or that the notice otherwise affected the manner in which defense counsel handled the proceedings. (*People v. Rodrigues, supra*, 8 Cal.4th at pp. 1153-1154.) Under these circumstances, no reasonable possibility of prejudice appears.[34] (*People v. Pinholster, supra*, 1 Cal.4th at p. 958.)

### b. *Nonstatutory Aggravation*

██ Defendant argues that the McCarthy burglary attempt was inadmissible under section 190.3, factor (b) because it did not involve the use or attempted use of force or violence or the express or implied threat to use force or violence.

Defendant's assertions are without merit. The prosecution's evidence tended to show that defendant, armed with a pipe, attempted to break into Beverly McCarthy's hotel room late at night knowing the room was occupied. The first time he attempted to break in through the room's sliding glass door, he left after McCarthy opened the drapes to the door and screamed. When defendant returned and tried to break in a second time, McCarthy's son opened the drapes and saw defendant carrying a pipe. Defendant raised the pipe over his head, and as McCarthy described it, the pipe looked "like it was going to come through the window on my son." Defendant did not leave until the son began pounding on the door. This evidence, taken together with other evidence showing that defendant previously used similar pipes to assault other victims when breaking into their homes (Mar) or hotel rooms (Griswold and Mr. and Mrs. N.), gave rise to the reasonable inference that the McCarthy incident involved the attempted use of force or violence, or at least a threat to use force or violence.

### c. *Double Jeopardy*

Arguing that he was tried once on the McCarthy incident and found guilty of attempted burglary based on larceny, not sex, as a motive for entry, and that he was tried twice for Griswold's murder without any sexual offense charged or proved, defendant claims the litigation of those matters in this trial violated constitutional protections against double jeopardy. The contention is without merit.

---

[34]Defendant claims that a continuance would not have been an appropriate remedy here. This claim is rejected, for as presented it is conjectural and lacks any support in the record.

Alternatively, defendant asserts that counsel rendered ineffective assistance in failing to request a continuance. This claim also is rejected, for the appellate record indicates no reason for counsel's inaction, and we have no basis for assessing whether or not such inaction was reasonable.

Because the prosecutor did not present any direct evidence of sexual motive in the McCarthy incident, the claim partially lacks factual foundation. ■■■ In any event, we have repeatedly held that "[t]he use under [section 190.3] factor (b) of a crime for which a defendant was previously convicted does not violate the constitutional and statutory bars against double jeopardy. The defendant is not being tried again, or made subject to punishment or conviction, for the same offense; instead, the evidence is admitted to assist the jury in its determination of the appropriate sentence on the current charge." (*People v. Cain* (1995) 10 Cal.4th 1, 71 [40 Cal.Rptr.2d 481, 892 P.2d 1224], and cases cited therein; see also *People v. Stanley* (1995) 10 Cal.4th 764, 820 [42 Cal.Rptr.2d 543, 897 P.2d 481].) We have also rejected the contention that *Taylor v. United States* (1990) 495 U.S. 575 [110 S.Ct. 2143, 109 L.Ed.2d 607] requires a contrary conclusion. (*People v. Stanley, supra,* 10 Cal.4th at p. 820.) We decline defendant's request to reexamine these precedents.

### 2. *Defendant's Confession*

As part of its case-in-chief, the prosecution sought to introduce evidence that in 1983 defendant confessed to the McCarthy and Griswold crimes, as well as the robbery and assault of Mr. and Mrs. N. In response to a defense motion, the trial court excluded any reference to a rape of Mrs. N. on corpus delicti grounds. The court subsequently held a hearing pursuant to Evidence Code section 402 on another defense motion seeking suppression of the confession on the ground that defendant's arrest on the night of the McCarthy incident was illegal, and that therefore the two subsequent interviews at the Pasadena jail, in which defendant confessed, were also improper. The court denied the motion, finding that ample cause supported defendant's detention and subsequent arrest.

On appeal, defendant contends the trial court erred in ruling the confession admissible. His principal argument asserts that he had invoked his right to remain silent during a custodial interrogation conducted by Officer Bradley on the night of the McCarthy incident, which rendered his subsequent confession to Lieutenant Huff inadmissible. Defendant also contends the following circumstances established the involuntariness of his confession: he was young; he had a low intelligence; he was left overnight in a cell; he was distraught; he had been smoking marijuana; and the police psychologically coerced his confession by falsely telling him his fingerprints were found on Mr. N.'s wallet. Because the confession was a cornerstone of the prosecution's evidence at the penalty phase, he argues, reversal of the penalty determination is required under *Chapman v. California, supra,* 386 U.S. 18.

In response, the People assert the following two bars to consideration of these claims. First, defendant is collaterally estopped from litigating these admissibility issues because they were actually litigated and resolved against him in his trial for the Griswold murder. (See *Gikas v. Zolin* (1993) 6 Cal.4th 841, 848-849 [25 Cal.Rptr.2d 500, 863 P.2d 745].) Second, defendant's failure to raise these issues at trial bars their assertion on appeal. (*People v. Ray* (1996) 13 Cal.4th 313, 339 [52 Cal.Rptr.2d 296, 914 P.2d 846] [where defendant sought suppression of confession at trial based solely on *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] (*Miranda*), claim pertaining to involuntariness of confession was barred on appeal because the parties had no incentive to litigate fully the theory below, and the trial court had no opportunity to resolve material factual disputes and make necessary factual findings].)

At trial, defendant never asked the court to determine whether Officer Bradley's questioning occurred in the context of a custodial interrogation, or whether defendant had invoked his right to remain silent at that time—even though such determinations are necessary to evaluate his principal appellate contention. ▮ Generally, when reviewing a trial court's decision that a statement was obtained in violation of *Miranda*, we "defer to the trial court's resolution of disputed facts, including the credibility of witnesses, if that resolution is supported by substantial evidence. [Citation.] Considering those facts, as found, together with the undisputed facts, we independently determine whether the challenged statement was obtained in violation of *Miranda*'s rules." (*People v. Weaver, supra,* 26 Cal.4th at p. 918.) Here, however, the relevant circumstances are not in dispute.

Additionally, the prosecutor noted at the suppression hearing that the confession's admissibility had been fully litigated in the Griswold case. But after stating her uncertainty whether res judicata principles applied in this particular case, she expressed a preference "to go ahead and allow [admissibility of the confession] to be litigated again." On balance, we believe it prudent to reach the merits of defendant's appellate contentions, and do so below.

The facts underlying defendant's contentions are as follows. Late on the night of January 22, 1983, Police Officer Bradley was on patrol when he received a radio broadcast regarding an attempted burglary at a nearby Holiday Inn. Bradley spotted defendant approximately eight blocks from the hotel. Because defendant resembled the described suspect and was acting suspiciously, Bradley detained him and conducted a patdown search for weapons. Defendant was carrying a folding knife in a sheath. Sergeant Schultze arrived to assist Bradley, and made a radio broadcast to have the

witnesses to the attempted burglary brought to the scene. Although defendant initially answered Bradley's questions about his recent whereabouts, defendant became uncooperative after Schultze's broadcast.

Officer Bradley testified that, after the broadcast, "I began to ask some more detailed questions to identify Mr. Farnam. [¶] I initially asked him his name." Defendant replied, "Fuck you. I'm not going to answer any of your fucking questions." When Bradley continued to ask basic interview questions, "what's your name, what's your birthday, where do you live, have you ever been arrested before," defendant "either did not answer or gave abusive responses." Defendant then "turned around and began to walk northbound on the sidewalk after making the statement, words to the effect 'Fuck this, I'm not staying here anymore.' " When defendant started to walk away, Bradley placed his hands on defendant's arm "to prevent him from leaving," and a scuffle ensued. Defendant grabbed hold of Bradley's baton and was about to strike Bradley's head, but was blocked. Defendant was arrested for assault with a deadly weapon on a police officer and was taken to the station for booking. At no time during these events did the police advise defendant of his *Miranda* rights. Nor did defendant reveal his name or other identifying information.

The next morning, Lieutenant Huff, who was investigating the Griswold case, went to speak to defendant in his jail cell. After defendant disclosed his name, Huff walked defendant to a small interview room. Once there, Huff read defendant his *Miranda* rights off a written card and ascertained that defendant wished to waive such rights. After securing an oral waiver, Huff and Sergeant Orr questioned defendant from approximately 9:30 a.m. to noon. Defendant admitted his involvement in the McCarthy, N., and Griswold crimes. In a second tape-recorded interview later that day, defendant signed a written waiver of his *Miranda* rights and reiterated the same information.

Under *Miranda, supra,* 384 U.S. at page 444 [86 S.Ct. at page 1612], "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. . . . Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." However, if the suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain

silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." (*Id.* at pp. 473-474 [86 S.Ct. at pp. 1627-1628], fn. omitted.)

Defendant makes no express claim here that *Miranda* warnings were required during the initial police contact on the night of the McCarthy incident. He argues, however, that the exercise of the right to remain silent, *prior to the receipt of Miranda warnings,* by an accused facing a custodial interrogation renders invalid a subsequent *Miranda* waiver during interrogation. (See *People v. Burton* (1971) 6 Cal.3d 375, 381, 384 [99 Cal.Rptr. 1, 491 P.2d 793].) Specifically, defendant contends that he invoked his right to silence by refusing to answer questions during Officer Bradley's custodial interrogation, and that his invocation of rights as such was sufficient to invalidate his subsequent *Miranda* waivers during Lieutenant Huff's interrogations the following day, thus rendering his confession to Huff inadmissible.

As an initial matter, we reject defendant's factual assertion that Officer Bradley was conducting a custodial interrogation at the time defendant refused to answer further questions regarding his identity and whereabouts and attempted to walk away. ▉ While the term "interrogation" refers to any words or actions on the part of police that are reasonably likely to elicit an incriminating response, it does not extend to inquiries—like those made here by Officer Bradley—that are "essentially 'limited to the purpose of identifying a person found under suspicious circumstances or near the scene of a recent crime[.]' " (*People v. Clair* (1992) 2 Cal.4th 629, 679-680 [7 Cal.Rptr.2d 564, 828 P.2d 705] [investigatory inquiries made during a temporary detention not a custodial interrogation].) Likewise, the term "custody" generally does not include "a temporary detention for investigation" where an officer detains a person to ask a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. (*Id.* at p. 679 [custody not found where an officer, with his gun drawn, approached the defendant at an apartment crime scene to ask who he was, whether he had identification and lived in the apartment, what he was doing in the apartment, and whether he knew the residents].) Notably, the fact that defendant started to leave the scene after refusing to respond to further questioning by the police indicates that, up to that moment, defendant did not reasonably believe that his freedom of action was being curtailed in any significant way. (See *Miranda,*

*supra*, 384 U.S. at p. 444 [86 S.Ct. at p. 1612]; *People v. Stansbury* (1995) 9 Cal.4th 824, 830 [38 Cal.Rptr.2d 394, 889 P.2d 588] [question is "whether a reasonable person in defendant's position would have felt he or she was in custody," disregarding any "uncommunicated subjective impressions of the police regarding defendant's custodial status"].)

██ In any event, the law is settled that when a suspect under interrogation makes an ambiguous statement that could be construed as an invocation of his or her *Miranda* rights, "the interrogators may clarify the suspect's comprehension of, and desire to invoke or waive, the *Miranda* rights." (*People v. Clark, supra*, 5 Cal.4th at p. 991; see also *People v. Johnson* (1993) 6 Cal.4th 1, 25-26 [23 Cal.Rptr.2d 593, 859 P.2d 673].) Here, defendant's prearrest refusal to answer Officer Bradley's investigatory inquiries, which was not made in response to an advisement of *Miranda* rights, fell short of a clear invocation of the Fifth Amendment right to remain silent. That is, defendant's comments ("I'm not going to answer any of your fucking questions"; "Fuck this, I'm not staying here anymore") and his attempt to walk away from the officers, viewed together, may simply have reflected that defendant did not want to stay at the scene and answer the particular questions posed by Officer Bradley. Under these circumstances, defendant's comprehension and desire to invoke or waive his right to remain silent and right to counsel warranted clarification. Lieutenant Huff's subsequent advisement of *Miranda* rights achieved just that; Huff did not ask defendant any substantive questions until defendant's position was clarified and valid *Miranda* waivers were obtained. We therefore reject the claim that defendant's confession to the Griswold, N., and McCarthy crimes was obtained in violation of *Miranda*.

We now turn to defendant's second contention, i.e., that other circumstances surrounding the postarrest interviews rendered his confession involuntary despite the fact that *Miranda* warnings were given. ██ In determining whether or not a defendant's confession is voluntary, the totality of circumstances must be considered. (*People v. Weaver, supra*, 26 Cal.4th at p. 920.) On appeal, "we independently examine the record, but, to the extent the facts conflict, we accept the version favorable to the People if supported by substantial evidence." (*Id.* at p. 921.)

As relevant here, the following facts were undisputed. The morning after defendant's late-night arrest, Lieutenant Huff met with defendant in his jail cell and learned his name. At that point, Huff knew that defendant had not yet been advised of his *Miranda* rights. Huff indicated he wanted to speak to defendant about an incident that occurred the night before and asked if defendant was willing to talk to him. The two then moved to a small

interview room, where Huff read defendant his *Miranda* rights. Defendant indicated he understood such rights and wished to waive them. Huff then interrogated defendant in a quiet and nonjudgmental manner for approximately two and one-half hours. Later that afternoon, defendant signed a written waiver of his *Miranda* rights and participated in a tape-recorded interview. Although defendant was emotional when interviewed (sometimes crying or being very quiet), he never indicated any desire to have an attorney, to be left alone, or to discontinue questioning. At no time did the police make any promises to defendant regarding prosecution. Defendant was only 18 years old at the time of the custodial interrogations. However, he had been arrested a number of times as a juvenile, and there is no indication he felt intimidated during Huff's interviews. Finally, although defendant suggests on appeal that his low intellect and marijuana smoking might have affected his judgment, nothing in the record supports such a conclusion. The totality of circumstances, we find, raises no doubt as to the volitional character of defendant's confession.

██ That Huff and his partner falsely informed defendant his fingerprints had been found on Mr. N.'s wallet did not render defendant's subsequent confession to the N. and Griswold crimes involuntary. "Lies told by the police to a suspect under questioning can affect the voluntariness of an ensuing confession, but they are not per se sufficient to make it involuntary." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240 [74 Cal.Rptr.2d 212, 954 P.2d 475]; *People v. Thompson, supra*, 50 Cal.3d at p. 167.) Where the deception is not of a type reasonably likely to procure an untrue statement, a finding of involuntariness is unwarranted. (*In re Walker* (1974) 10 Cal.3d 764, 777 [112 Cal.Rptr. 177, 518 P.2d 1129] [confession found voluntary where wounded defendant was told, perhaps deceptively, that he might die before reaching the hospital and that he should talk to close the record].)

Here, the deception concerning defendant's fingerprints was unlikely to produce a false confession. (See *People v. Thompson, supra*, 50 Cal.3d at pp. 166-167 [defendant's statements properly admitted even though police falsely stated that incriminating evidence had been found]; *People v. Watkins* (1970) 6 Cal.App.3d 119, 124-125 [85 Cal.Rptr. 621] [confession found admissible where defendant was falsely told that his fingerprints had been found on the getaway car].) The record is otherwise devoid of any evidence showing a coercive climate, use of pressure tactics, or promises of help or leniency. On this point, we observe the situation here is distinguishable from that in *People v. Hogan, supra*, 31 Cal.3d 815, where the defendant, confronted with false statements purporting to show his guilt of murder, came to doubt his own sanity and confessed in response to a police offer to get him help for his alleged mental condition. (*Id.* at pp. 840-841.)

Viewing the totality of the circumstances, we are satisfied that defendant's confession was the product of a rational intellect and a free will. (*In re Walker, supra*, 10 Cal.3d at p. 776.)

### 3. *Denial of Lineup*

At trial, defendant moved on due process grounds to have Mr. and Mrs. N. attend a lineup in order to test their ability to make an identification. The defense noted that six years had passed since Mr. and Mrs. N. had been robbed and that one crime report contained the notation "suspect, M/B" (supposedly indicating the victims' description of the suspect as "Male/Black"), whereas defendant was Caucasian.[35] The trial court denied the motion. On appeal, defendant claims the court's ruling violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

In *Evans v. Superior Court* (1974) 11 Cal.3d 617, 625 [114 Cal.Rptr. 121, 522 P.2d 681] (*Evans*), we concluded that "due process requires in an appropriate case that an accused, upon timely request therefor, be afforded a pretrial lineup in which witnesses to the alleged criminal conduct can participate. The right to a lineup arises, however, only when eyewitness identification is shown to be a material issue and there exists a reasonable likelihood of a mistaken identification which a lineup would tend to resolve." (Fn. omitted.) Although *Evans* was decided in the context of a guilt phase witness identification, we have applied its principles in addressing lineup claims involving penalty phase witnesses whose testimony pertained to alleged aggravating evidence. (See *People v. Williams, supra*, 16 Cal.4th at pp. 235-236; *People v. Rodrigues, supra*, 8 Cal.4th at p. 1155.)

Here, the People argue that the concerns addressed in *Evans, supra*, 11 Cal.3d 617, apply only in the guilt phase and that due process does not require a right to a lineup so as to test the reliability of "other crimes" evidence during the penalty phase of a capital trial. The People reason as follows. Differing treatment is warranted because "[u]nlike a guilt determination where identity is a necessary element that the prosecution must prove, proof of an aggravating factor in the penalty phase of a capital case and the facts supporting the aggravating factor such as identity are not 'elements' of the capital offense." The entire jury need not have found the prosecutor met her burden of proof on the other crimes evidence before a single juror could consider such evidence. (See *People v. Sims, supra*, 5 Cal.4th at p. 462.) Accordingly, "the concern for reliability of each aggravating circumstance in

---

[35]Two other crime reports, however, indicated that the victims described the suspect as being White.

a penalty determination is not the same magnitude of concern for reliability as that which exists during the guilt determination." Due process, therefore, does not demand that, in the penalty phase of a capital case, a lineup be required to test the reliability of eyewitness identifications for other crimes evidence presented in aggravation. In pressing this argument, the People argue that *People v. Williams, supra,* 16 Cal.4th 153, and *People v. Rodrigues, supra,* 8 Cal.4th 1060, should not be controlling because neither case specifically considered this issue.

We need not address the validity of the People's claimed distinction in order to resolve defendant's due process claim. Defendant in any event was not entitled to a lineup under *Evans* in the absence of a timely request and a showing that eyewitness identification was "a material issue" and that "a reasonable likelihood of a mistaken identification" existed "which a lineup would tend to resolve." (*Evans, supra,* 11 Cal.3d at p. 625, fn. omitted.) Even assuming defendant's motion was not untimely, the trial court properly ruled that eyewitness identification by Mr. and Mrs. N. was not a material issue and that no reasonable likelihood of misidentification existed. Significantly, defendant had given a detailed confession to the police in which he admitted he was the perpetrator of the crimes against these victims. Since that confession was properly admitted (*ante,* pt. II.C.2., at p. 177), we reject defendant's due process contention.

Defendant's other assignments of constitutional error also fail. Having failed to raise them at trial, he is barred from raising them on appeal. (See *People v. McPeters, supra,* 2 Cal.4th at p. 1174.) In any event, the trial court's action did not implicate any of the cited constitutional protections.

### 4. *Admission of Griswold Photographs*

As indicated, the prosecution presented evidence of Griswold's murder at the penalty phase. During a hearing, the prosecutor initially offered approximately 46 autopsy photographs showing injuries suffered by Griswold. After defendant objected to some, but not all, of the photographs, the prosecutor voluntarily withdrew some and the trial court acted to exclude others. Ultimately, the following 32 photographs were ruled admissible: (1) five pre-autopsy photographs showing ligatures on various parts of Griswold's body; (2) four photographs showing head and face wounds; (3) five photographs showing injuries on the hands and arms; (4) five photographs showing wounds on the abdomen; (5) three photographs showing feet and calf injuries; (6) seven photographs showing injuries on the back, side, and posterior; and (7) three photographs showing wounds to the neck. Dr. Cogan, a deputy medical examiner, utilized the photographs to explain to the

jury the nature of the 71 wounds he observed on Griswold's body and to illustrate his opinion regarding the torturous manner of her death.

Defendant contends that the trial court admitted these photographs in violation of Evidence Code sections 350 and 352, that the prosecutor used the photographs in argument to inflame the jury, and that the combination of these two factors violated his federal constitutional rights and resulted in an unreliable death penalty verdict.

At the outset, we observe that defendant has forfeited appellate review of his admissibility contention as to all but seven of the photographs because he failed to interpose timely objections at trial. (Evid. Code, § 353, subd. (a); *People v. Hart, supra,* 20 Cal.4th at p. 644.) Moreover, defendant's appeal fails to specify which particular photographs he contends were improperly admitted. But even were we to overlook these procedural deficiencies, we would find that *all* of the photographs were properly admitted for the reasons below.

■ " 'The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory.' [Citation.] On appeal, we apply the deferential abuse of discretion standard when reviewing the trial court's ruling." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1136 [113 Cal.Rptr.2d 27, 33 P.3d 450].) Applying that standard here, we find no abuse of discretion.

"Generally, photographs that show the manner in which a victim was wounded are relevant to the determination of malice, aggravation and penalty." (*People v. Wader* (1993) 5 Cal.4th 610, 655 [20 Cal.Rptr.2d 788, 854 P.2d 80]; see also *People v. Lucas* (1995) 12 Cal.4th 415, 450 [48 Cal.Rptr.2d 525, 907 P.2d 373].) ■ Here, the autopsy photographs not only showed criminal activity that involved the use of force or violence, but they aided Dr. Cogan in his explanation to the jury regarding the massive number and nature of the wounds inflicted upon the victim prior to death. They clearly were relevant to the prosecution's penalty phase case under factor (b) of section 190.3, and indeed, highly probative of the prosecution's theory that Griswold was the victim of a torture murder.

Contrary to defendant's suggestion otherwise, the photographs, which we have reviewed, were not impermissibly cumulative or inflammatory. Photographs are not cumulative simply because they illustrate facts otherwise presented through testimony. (*People v. Anderson* (2001) 25 Cal.4th 543, 592 [106 Cal.Rptr.2d 575, 22 P.3d 347]; *People v. Box, supra,* 23 Cal.4th at p. 1199.) Moreover, while the number of photographs admitted here was

relatively large and several were superficially similar, they provided differ- -
ent views of Griswold's wounds that corroborated Dr. Cogan's testimony
and were helpful to a full understanding of the prosecution's torture-murder
theory. None of the photographs, we observe, is unduly gruesome or likely
to inflame the passions of a jury. In sum, the trial court could properly
conclude, in its discretion, to admit the photographs as having probative
value that outweighed their potentially prejudicial effect.

██ Defendant raises a related misconduct claim premised on the itali-
cized portion of the following comments made by the prosecutor during her
closing argument: "Now for the worst crime of them all, the murder of
Barbara Griswold. I told you in my opening statement that words really
could not convey the horror that was inflicted on her. *I'm sure you could not
imagine anything as gruesome as this.* [¶] *These photographs are truly
frightening, aren't they?* What makes them so bad is not that they're gory,
because you've seen pictures worse than this on TV every day. What we see
here and what makes it so awful is the knowledge that [Griswold] was alive
to suffer every single one of these blows." (Italics added.)

Any harm that could conceivably have resulted from the foregoing com-
ments could have been cured by an admonition. Therefore, defendant's
failure to make a timely objection and request for admonishment bars his
contention on appeal. (*People v. Earp, supra,* 20 Cal.4th at p. 858.)

In any case, the prosecutor's argument, viewed in context, represented a
fair comment on the nature of the criminal acts committed against Griswold
and was based on inferences that could reasonably be drawn from the
photographs and Dr. Cogan's testimony. (See *People v. Hovey* (1988) 44
Cal.3d 543, 579 [244 Cal.Rptr. 121, 749 P.2d 776].) That the prosecutor
employed the terms "gruesome" and "truly frightening" to describe the
criminal acts and the victim's consequent suffering is insufficient by itself to
establish that deceptive or reprehensible methods of persuasion were used.
(See *ibid.* [prosecutor's argument that the defendant's crime was "the worst
possible" or the most "incredibly horrible" constituted a reasonably fair
comment on the evidence].) The claim is rejected.[36]

---

[36]We additionally reject defendant's related constitutional contentions. Defendant's failure
to raise such contentions in the trial court bars them on appeal. (E.g., *People v. Anderson,
supra,* 25 Cal.4th at p. 592, fn. 17.) For the reasons stated above, we find them unpersuasive
in any event.

In light of our conclusions above, we reject defendant's further claims that trial counsel
were ineffective in failing to make all the noted objections. Counsel had no obligation to
interpose meritless objections.

### 5. Cross-examination Regarding Escape and Escape Attempt

Defendant contends the trial court erroneously permitted the prosecutor to cross-examine him concerning his nonviolent escape from a youth facility known as Camp Barley Flats and a later plan to stab a prison guard during a plot to escape from a California Youth Authority (CYA) facility. Defendant first argues the incidents did not constitute evidence of criminal activity involving the use of force or violence as contemplated in section 190.3. He also complains that the prosecutor's inappropriate reliance on hearsay deprived him of his state and federal constitutional rights to confrontation, due process, and a fair and reliable penalty determination. Reversal, he argues, is compelled under the harmless error standard of *Chapman v. California, supra,* 386 U.S. 18.

### a. Defendant's Escape from Camp Barley Flats

On cross-examination, the prosecutor elicited the following testimony from defendant. Defendant had been at Camp Barley Flats for "two or three days" before he made an escape while being transported by van to juvenile hall for an evaluation. When the van stopped at a traffic light, defendant, who was handcuffed, opened the door and ran away. Defendant outran his counselor and subsequently avoided capture by a motorcycle officer. Thereafter he fled to Washington.

Defendant argues that the foregoing cross-examination exceeded the scope of direct examination and that the escape incident itself was inadmissible under section 190.3 because no force or violence was involved. We disagree.

Although defendant appears to have preserved his section 190.3 contention by having lodged an appropriate objection prior to the start of the penalty phase, he has forfeited review of the permissible scope of cross-examination because he failed to interpose a timely objection to the prosecutor's questions. In any case, as set forth below, both contentions are lacking in merit.

It is settled that the trial court is given wide discretion in controlling the scope of relevant cross-examination. (See *People v. Price, supra,* 1 Cal.4th at p. 477.) Here, defendant testified on direct examination that he spent "four to seven" days at Camp Barley Flats in 1981 as a result of a burglary and that he "[g]ot along . . . good" with the staff and inmates there. As part of the same line of questioning on direct, defendant testified that he spent time at the county jail, at other juvenile camps and facilities, and at the CYA, and indicated that nothing improper or unusual occurred

during many of those stays except that he hurt himself once and attempted suicide twice because of depression. In light of this direct testimony and the impression it likely left on the jury, the prosecutor was entitled to cross-examine defendant about his escape from Camp Barley Flats two or three days after his arrival there. Although the prosecutor's questions pertained to a matter that had not been discussed on direct, we are persuaded that the trial court acted well within its broad discretion in permitting the prosecutor to elicit such testimony on cross-examination. (See, e.g., *People v. Price, supra,* 1 Cal.4th at pp. 476-477 [prosecutor properly cross-examined the defendant about a prior robbery after he testified on direct that he was incapable of murdering the victim].)

Moreover, reference to the escape was not barred per se by section 190.3. ■ Generally, section 190.3 allows the prosecution, at the penalty phase, to introduce evidence in aggravation consisting of prior criminal activity by the defendant, so long as the criminal activity involved the use or attempted use of force or violence or the express or implied threat to use force or violence and proper notice to the defense is given. (*Id.,* 2d & 4th pars.; see also *id.,* 1st par.) Here, however, the prosecutor never relied on or sought to use evidence of the Camp Barley Flats escape as a circumstance in aggravation. Rather, as discussed above, she elicited the escape testimony for a proper, independent purpose, i.e., to rebut impressions left by defendant's own testimony on direct. No error appears.

### b. *The CYA Escape Plan*

Prior to the start of the penalty phase, the trial court ruled that the prosecution could present as a circumstance in aggravation defendant's alleged plan in 1982 to stab a prison guard during an escape from a CYA facility. Although the prosecutor did not introduce the incident during her case-in-chief, she raised the topic with defendant during his cross-examination. Specifically, she asked defendant if he had planned an escape while at CYA in 1982 and whether the plan involved killing a female staff member. Defendant admitted that he had planned an escape involving two other juveniles and that the plan called for one cohort to start a fight in order to distract the guards. Although defendant conceded that one of his cohorts mentioned he could "take out" a staff member with a pencil, defendant claimed he kept telling the cohort that such action was unnecessary. Defendant denied that the plan called for the killing of a staff member.

Defendant argues the trial court should have disallowed the foregoing cross-examination. He claims the escape plan was inadmissible under section 190.3 because it did not involve any "concrete" plan or agreement to use

violence by anyone, including himself. He also argues that the plan was outside the proper scope of rebuttal and that the questioning was impermissibly based on hearsay.

Defendant preserved his section 190.3 contention by having made a proper objection prior to the start of the penalty phase, but he failed to interject timely objections based on scope-of-rebuttal and hearsay grounds during the prosecutor's questioning. In any event, as set forth below, his contentions warrant no relief.

Although the prosecutor had obtained a ruling allowing presentation of the CYA escape plan pursuant to section 190.3, she ultimately forwent such presentation and instead cross-examined defendant on the topic in rebuttal. Unlike defendant's escape from Camp Barley Flats, however, an escape from CYA never actually occurred, and there was no indication that defendant or his cohorts attempted to act on the escape plan before it evidently was discovered. Nor, apparently, was there any proof that defendant was ever cited or disciplined for the plan. Consequently, testimony regarding the CYA escape plan would not have appeared to rebut defendant's direct testimony suggesting that nothing unusual had occurred during his stays at the county jail and various juvenile and CYA facilities except for his self-injury and attempted suicides. Nor would it have rebutted the testimony that he got along well with staff members and inmates at some of those places. On this record, it appears that defendant's direct testimony did not invite cross-examination about the escape plan. ▓▓▓ Nonetheless, we determine whether it is reasonably possible that any trial court error in permitting the cross-examination affected the verdict (*People v. Brown* (1988) 46 Cal.3d 432, 446-449 [250 Cal.Rptr. 604, 758 P.2d 1135]) and whether federal constitutional standards were violated.

In reviewing the record of the penalty phase, we observe the jurors had been presented with overwhelming aggravating evidence showing that defendant was a repeat sexual predator and murderer, including evidence that defendant found Lillian Mar and Barbara Griswold alone in their respective quarters, and that he bludgeoned and sexually attacked them before murdering them. The jurors also were presented with evidence showing that defendant relentlessly tortured Griswold by striking her repeatedly with a threaded metal pipe and a belt. According to expert testimony, Griswold had been alive throughout the ordeal and had received most of the wounds while bound and defenseless. Finally, the jurors heard testimony that even the presence of another person did not deter defendant from using or threatening to use force or violence in the crimes involving Mr. and Mrs. N., Beverly McCarthy, and Officer Bradley.

In light of all this evidence demonstrating that defendant was extremely violent and capable of extreme acts of cruelty and aggression, it was not reasonably possible that the jurors could have drawn any more damaging inferences from the relatively brief testimony pertaining to defendant's planned escape from CYA. (*People v. Wright* (1990) 52 Cal.3d 367, 428-429 [276 Cal.Rptr. 731, 802 P.2d 221]; *People v. Brown, supra*, 46 Cal.3d at p. 449.) The evidence showing the brutality of the Mar and Griswold murders and the brazen nature of the N., McCarthy, and Bradley crimes so completely overshadowed defendant's testimony about the CYA escape plan that the latter could not possibly have enhanced the jurors' perception of him as a violent man.[37]

Defendant additionally contends that, in light of cross-examination, the jurors impermissibly might have considered him an escape risk if given a life sentence without the possibility of parole. The prosecutor, however, never argued to the jury that the possibility of escape constituted an additional reason for imposing the death penalty. Indeed, she neglected to even mention the CYA escape plan in her closing argument. Moreover, the jurors were specifically instructed not to consider any aggravating circumstances other than those listed by the court as a basis for imposing the death penalty; that list did not include any reference to an escape or an escape plan. Under these circumstances, no relief is warranted. (See *People v. Kaurish* (1990) 52 Cal.3d 648, 711 [276 Cal.Rptr. 788, 802 P.2d 278] [any improper suggestion concerning the possibility of escape may be neutralized depending upon defense evidence and prosecutorial comment about the topic, and the giving of a proper jury instruction].)

### 6. *Instructional Error*

#### a. *Meaning of Life Without Possibility of Parole*

■ On appeal, defendant contends the trial court erred and violated his state and federal constitutional rights to due process and a reliable penalty determination by failing to instruct the jury, sua sponte, that he would be executed if sentenced to death, and that he would never be released from prison if sentenced to life imprisonment without the possibility of parole. Such an instruction, however, would have been inaccurate in light of the Governor's power to ameliorate any sentence through use of the commutation or pardon power. (*People v. Arias, supra*, 13 Cal.4th at p. 172; see also

---

[37]Defendant additionally complains of improper cross-examination concerning alleged statements he made in 1989 to jail staff or other inmates regarding "escapes as a juvenile." We reject this claim as not properly raised. (See *People v. Barnett, supra*, 17 Cal.4th at p. 1182.)

*People v. Carpenter* (1999) 21 Cal.4th 1016, 1063 [90 Cal.Rptr.2d 607, 988 P.2d 531].) No error or constitutional violation appears.

Defendant is correct that some of the jurors expressed misconceptions during voir dire regarding the effect of a life without possibility of parole sentence. But the trial court addressed that particular concern by giving an instruction specifically requested by defense counsel.[38] Defendant does not suggest the instruction was in error.

Finally, defendant asserts that the prosecutor's argument to the jury about future dangerousness implied he would be released if sentenced to life without possibility of parole. If trial counsel believed the prosecutor made some improper suggestion, they could have objected and requested an admonishment to cure any potential harm. They did not. In any case, the court's instruction adequately addressed such concern. (See *ante*, fn. 38.)

b. *Aggravating and Mitigating Circumstances*

The penalty phase jury was instructed to reach its sentencing determination by weighing the factors in aggravation against the factors in mitigation. (CALJIC No. 8.88.) The applicable factors were set forth in the language of CALJIC No. 8.85, which derives from section 190.3, factors (a) through (k). On appeal, defendant contends these instructions were unconstitutionally vague under the Eighth Amendment to the United States Constitution. He also contends the court's instruction with a unitary list of aggravating and mitigating factors, including some which were inapplicable to his case, violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and bestowed unchanneled discretion upon the jury.

Contrary to defendant's assertions, the trial court had no obligation to advise the jury which statutory factors are relevant solely as mitigating circumstances and which are relevant solely as aggravating circumstances. (*People v. Frye* (1998) 18 Cal.4th 894, 1026 [77 Cal.Rptr.2d 25, 959 P.2d 183]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1383 [65 Cal.Rptr.2d 145, 939 P.2d 259].) Moreover, it was proper for the court to instruct the jury in the language of CALJIC No. 8.85 without deleting certain factors that were

---

[38]The instruction read: "Statements by some jurors during jury selection showed an awareness of news reports concerning other cases or sentences of death were not carried out for legal reasons or where persons sentenced to life imprisonment may have been considered for parole. [¶] Under the 1978 death penalty law, which governs this case, the only possible penalties are death or life imprisonment without the possibility of parole. [¶] In the past, other cases were decided under other laws which are no longer in effect. [¶] You must not consider other cases or news reports or speculate about actions by other authorities in arriving at a penalty verdict in this case. Those are matters that must not affect your verdict."

inapplicable to defendant's case. (*People v. Earp, supra*, 20 Cal.4th at p. 899, fn. 13; *People v. Frye, supra*, 18 Cal.4th at p. 1027.)

In short, CALJIC No. 8.85 is not unconstitutionally vague and does not allow the penalty process to proceed arbitrarily or capriciously. (*People v. Lucero* (2000) 23 Cal.4th 692, 728 [97 Cal.Rptr.2d 871, 3 P.3d 248]; *People v. Earp, supra*, 20 Cal.4th at pp. 898-899.)

### c. *CALJIC No. 8.88*

Defendant argues that the trial court's utilization of CALJIC No. 8.88, the principal sentencing instruction, violated his federal and state constitutional rights. In essence, defendant asserts that the instruction, as it reflects California's 1978 death penalty law, is constitutionally defective. We have consistently rejected identical claims, as follows.

The capital sentencing scheme is not unconstitutional insofar as it does not require the jury to render a statement of reasons or to make unanimous written findings on the aggravating factors supporting its verdict. (*People v. Welch* (1999) 20 Cal.4th 701, 772 [85 Cal.Rptr.2d 203, 976 P.2d 754]; *People v. Sanders, supra*, 11 Cal.4th at p. 559.) There is no constitutional requirement that the jury, in order to return a verdict of death, must unanimously find that aggravating factors outweigh the mitigating factors beyond a reasonable doubt or that death is the appropriate remedy beyond a reasonable doubt. (*People v. Mendoza* (2000) 24 Cal.4th 130, 191 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Barnett, supra*, 17 Cal.4th at p. 1178; *People v. Bradford* (1997) 14 Cal.4th 1005, 1059 [60 Cal.Rptr.2d 225, 929 P.2d 544].) Defendant's arguments fail to convince us to revisit any of these holdings.

### 7. *Death Penalty Statute*

Defendant contends that California's death penalty statute violates the Eighth and Fourteenth Amendments to the federal Constitution because it is vague and overbroad. Our decisions hold otherwise, as follows.

The 1978 capital sentencing scheme does not contain so many special circumstances that it fails to perform the constitutionally mandated narrowing function. (*People v. Mendoza, supra*, 24 Cal.4th at p. 191; *People v. Barnett, supra*, 17 Cal.4th at p. 1179; *People v. Sanchez* (1995) 12 Cal.4th 1, 60-61 [47 Cal.Rptr.2d 843, 906 P.2d 1129].) Nor is the system constitutionally defective in allowing the same facts to be used as a special circumstance supporting death eligibility and as an aggravating factor supporting the death

penalty, for "the facts underlying a special circumstance finding serve distinct purposes at different phases of trial." (*People v. Millwee, supra*, 18 Cal.4th at pp. 164-165, fn. 35, and cases cited therein.) Defendant's contentions fail to persuade us that reconsideration of our decisions is warranted.

Defendant additionally argues that the lack of any statutory requirement of intercase proportionality review, as well as the absence of any such review by the trial court below, violates his federal constitutional rights to equal protection and meaningful appellate review. As defendant concedes, we have repeatedly rejected this argument. (E.g., *People v. Kipp, supra*, 26 Cal.4th at p. 1139; *People v. Barnett, supra*, 17 Cal.4th at p. 1182.) We see no reason to rule differently here.

### 8. *Automatic Motion for Modification of Death Verdict*

After the jury returned its verdict of death, the trial judge made a few concluding remarks to the jury, including the following. "[L]et me indicate to you that in my humble opinion, your decision was correct. And that's based on about 42 years of experience in the justice system, over half of which has been on the bench, for whatever value that may be to you." A month later, the defense filed a motion for modification of the death judgment in which it requested the judge either to reduce the judgment to life imprisonment without the possibility of parole or to recuse himself and allow another judge to determine the modification motion. The judge denied modification.

On appeal, defendant first contends the trial judge should have recused himself because his concluding remarks to the jury reflected bias and an inability to review his modification motion fairly.[39] We disagree.

Although trial courts may understandably wish to express gratitude to jurors in lengthy capital trials such as this, they must refrain from making any comment indicating that they cannot, or will not, perform their obligations fairly and impartially under the law. (*People v. Belmontes* (1988) 45 Cal.3d 744, 816 [248 Cal.Rptr. 126, 755 P.2d 310].) Here, the trial judge's

---

[39]The People argue that this claim is not cognizable on appeal because, even in a capital case, "all litigants who seek to challenge denial of a statutory judicial disqualification motion are relegated to writ review" as described in Code of Civil Procedure section 170.3, subdivision (d). (*People v. Brown* (1993) 6 Cal.4th 322, 335 [24 Cal.Rptr.2d 710, 862 P.2d 710].) "[A] litigant may, and should, seek to resolve such issues by statutory means, and . . . his negligent failure to do so may constitute a forfeiture of his constitutional claim." (*Id.* at p. 336.) Even assuming defense counsel's failure to seek writ review here resulted in a forfeiture, we proceed to the merits in response to defendant's assertion that the failure to do so constituted ineffective assistance of counsel.

comment to the jury that its "decision was correct" was inappropriate to the extent it suggested he had already decided to deny modification without a proper hearing on the matter and without complying with his independent review obligations under section 190.4, subdivision (e).[40] (*People v. Belmontes, supra,* 45 Cal.3d at p. 816.) To resolve defendant's recusal claim, however, we must determine whether the judge's remarks establish an inference that he *in fact* had prejudged the merits of modification, and therefore could not fairly and impartially perform his statutory obligations in ruling on defendant's subsequent modification request. (*Ibid.*)

In *People v. Belmontes, supra,* 45 Cal.3d at page 815, the trial judge in a capital case wrote a letter to the jurors, prior to a hearing on modification, telling them: " '*Your decision is acceptable and shall be followed.*' " After duly noting the presumption that "official duty has been regularly performed" (Evid. Code, § 664), we found that the trial judge's explanation for the remark (it " 'was made for therapeutic purpose more than a legal purpose' ") and his detailed findings weighing the aggravating and mitigating factors refuted any conclusion that the judge had failed to make the " 'independent determination' " respecting the appropriateness of the penalty verdict as required by section 190.4, subdivision (e). (*People v. Belmontes, supra,* 45 Cal.3d at p. 816.) Here, defendant argues that the trial judge's failure to distance himself from his statements to the jurors and his failure to offer any specific findings compel a different result. We disagree.

Although the trial judge here initially indicated to the jurors that he thought their penalty verdict was correct, he did not suggest that he was committed to that view, and his remarks did not imply that further examination of the verdict was unnecessary. Moreover, while the judge here did not explain his statements, we may reasonably infer, from his utilization of the phrase "for whatever value that may be to you" in concluding his remarks, that the judge intended his comments to have therapeutic value for the jurors rather than a legal purpose, just as in *People v. Belmontes.*

More significantly, the judge explained to the parties at the subsequent modification hearing that he had "considered the matter in careful detail" since the conclusion of the trial, and that, after having reviewed the People's

---

[40]Section 190.4, subdivision (e) states in relevant part that in ruling on an automatic application for modification of a verdict of death, "the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings."

motion in support of the death judgment and the defense's motion to reduce, the opinion he initially formed "has not changed or been altered." In response to the prosecutor's inquiries, the judge further clarified that he "independently reviewed and evaluated each of the factors under [section] 190.3 [factors] (a) through (k)," that he "independently" found upon re-weighing the factors that the factors in aggravation "overwhelmingly" outweighed the factors in mitigation "to the degree that the only appropriate sentence is death." On this record, we are satisfied that the trial judge did not in fact prejudge the modification issue. His remarks at the modification hearing reflect that he was willing and capable of fairly and impartially performing his statutory duty to review the jury's death verdict independently, and that he did so. No recusal was necessary.

Defendant complains that the trial judge made no mention of any particular aggravating or mitigating circumstance at the hearing and offered no explanation as to what weight he may have given to any of those circumstances, but this ignores the context of the judge's remarks at the modification hearing. As noted, the judge expressly confirmed he had "independently reviewed and evaluated each of the factors under [section] 190.3 [factors] (a) through (k)." He also stated that, after having "considered the matter in careful detail," he independently concluded that the factors in aggravation "overwhelmingly" outweighed the factors in mitigation. Although the judge did not single out specific factors in aggravation or mitigation, his statements were sufficiently specific to demonstrate his performance of the statutory requirement to review all the evidence independently. (§ 190.4, subd. (e).)

Undoubtedly, a more detailed statement of reasons would have been helpful to understand more fully the trial court's independent determination that death was warranted. But the record here not only establishes that the court acted on a proper understanding of its statutory duties, it amply justifies the court's conclusion as well. Under these circumstances, we have no hesitation rejecting defendant's claims. (See *People v. Sully* (1991) 53 Cal.3d 1195, 1251 [283 Cal.Rptr. 144, 812 P.2d 163]; *People v. Hernandez* (1988) 47 Cal.3d 315, 371-373 [253 Cal.Rptr. 199, 763 P.2d 1289]; *People v. Heishman* (1988) 45 Cal.3d 147, 199-202 [246 Cal.Rptr. 673, 753 P.2d 629] [holding that defendant was not prejudiced by trial court's failure to state reasons for denial of modification]; cf. *People v. Rodriguez* (1986) 42 Cal.3d 730, 792-794 [230 Cal.Rptr. 667, 726 P.2d 113] [remand for new hearing ordered where record reflected trial court's erroneously narrow view of the scope of its statutory powers]; *People v. Bonillas* (1989) 48 Cal.3d 757, 801 [257 Cal.Rptr. 895, 771 P.2d 844] [same where the trial court's statement of reasons indicated it did not exercise independent judgment in reweighing the evidence].)

Defendant next claims the trial court erroneously read and considered the probation report prior to ruling on the modification motion.

In ruling on a modification motion, a trial court must not consider extraneous material or facts not presented to the jury, such as a probation report. (*People v. Coddington* (2000) 23 Cal.4th 529, 644 [97 Cal.Rptr.2d 528, 2 P.3d 1081]; *People v. Wader, supra,* 5 Cal.4th at p. 665.) "However, absent a contrary indication in the record, we assume that the court was not influenced by the report in ruling on the motion." (*People v. Livaditis* (1992) 2 Cal.4th 759, 787 [9 Cal.Rptr.2d 72, 831 P.2d 297]; see *People v. Dennis, supra,* 17 Cal.4th at p. 551.) Here, the record contains no indication that the trial court relied on defendant's probation report in deciding the modification issue. The court did not mention the report; nor was the report discussed in the parties' briefing on the issue. The claim is rejected.

In sum, the trial court's actions did not deprive defendant of his statutory rights or his constitutional rights to due process and a reliable penalty verdict.

### 9. *Prosecutorial Misconduct*

Defendant contends the prosecutor committed numerous acts of prejudicial misconduct during the penalty phase. Considered individually and cumulatively, he argues, such acts violated his federal constitutional rights to a fair trial, notice, an unbiased jury, cross-examination and confrontation, due process, and to an individualized and reliable penalty determination.

Initially, we observe defendant did not timely object and request admonishment at trial for most of the instances of alleged misconduct. There is no indication that meritorious objections would have been futile, and admonitions could have cured any potential harm resulting from the perceived misconduct. Accordingly, defendant has failed to preserve most of his contentions for appellate review. (*People v. Earp, supra,* 20 Cal.4th at p. 858.) In any event, as we discuss below, no instance of prejudicial misconduct appears.

Defendant first complains the prosecutor cross-examined him repeatedly about sodomizing Mrs. Mar, without any factual support. At trial, however, substantial evidence of sodomy had been presented, including expert testimony that semen had been found in the victim's anus. Since defendant, on direct examination, omitted any mention of sodomy in recounting his

crimes against the victim, the prosecutor properly raised the topic during cross-examination.

Defendant also claims the prosecutor posed the following argumentative and compound question to him: "So somehow after you pulled the scarf tight enough to knock her out, she was unconscious, you put a knot in it, you hit her over the head and raped her and she was able to get up and run behind you. [¶] Is that your testimony?" While that question might have been subject to a proper objection, it merely distilled what the prosecutor believed defendant's testimony to be and did not reflect misconduct. Had defendant objected to or disagreed with any part of the prosecutor's description of his testimony, he could easily have said so instead of responding "[y]es" to the question.

 Defendant next argues the prosecutor improperly asked whether he "enjoy[ed]" raping Mrs. Mar and felt "strong" and "powerful" while raping and strangling her. Again, no misconduct appears. The prosecutor was entitled to inquire into the circumstances of the underlying crimes. (§ 190.3, factor (a).) Moreover, the questioning was proper in light of testimony by Dr. Alvin Davis, the defense psychiatrist, that defendant had "repeatedly expressed bewilderment or lack of understanding as to why he had killed anyone."

Defendant additionally contends the prosecutor suggested through improper questioning that Dr. Davis had been sanctioned by the court. Not so. As the record discloses, the prosecutor sought to ask Dr. Davis why he no longer served on a panel of psychiatrists appointed to assist the court in mental competency determinations, and she based this inquiry on information that the doctor had been removed for lack of competence. Accordingly, the topic fell within the proper scope of inquiry regarding Dr. Davis's qualifications as an expert witness.

Nor did the prosecutor improperly question Dr. Davis about: (1) police reports concerning "20 residential burglaries" committed by defendant; (2) "phone sex" and bondage fantasies; and (3) "fake remorse." First, the prosecutor properly relied on the police reports, which appeared to indicate that food was not the object of the reported burglaries, to test Dr. Davis's opinion that defendant was truthful in claiming he burglarized to get food.[41] Second, after ascertaining that Dr. Davis did in fact review statements made by the longtime wife or girlfriend of defendant's brother, to the effect

---

[41] We note, moreover, that defense counsel initially raised the subject of defendant's past burglaries in their direct examination of defendant's mother earlier in the penalty phase.

that defendant told her "while she was living with his brother and he fantasized about rape and bondage and kind of engaged in phone sex with her," the prosecutor could properly ask Dr. Davis whether his review of such statements affected his opinion that defendant was able to maintain stable relationships with family members and others. Third, as defendant acknowledges, the prosecutor could properly cross-examine Dr. Davis on the subject of "fake remorse" given his direct examination testimony.

Defendant also argues the prosecutor committed prejudicial misconduct during her closing argument by: (1) commenting on defendant's exercise of rights and lack of remorse; (2) arguing nonstatutory aggravation; (3) inviting the jury to discount the evidence in mitigation; and (4) advancing her own personal opinion of witnesses' credibility. We disagree.

Defendant first claims the prosecutor improperly commented on defendant's exercise of his Fifth Amendment right not to discuss the Griswold offense during the penalty phase.[42] He is mistaken. Although the prosecutor remarked that defendant "wouldn't allow himself to be drawn into saying anything that could be used or later connected to prove against him for the Barbara Griswold murder," she did so clearly as part of her rebuttal to the defense's case that defendant's low intelligence constituted a mitigating factor. Moreover, the prosecutor's comments did not go beyond defendant's own testimony about the reason for his silence.[43] And contrary to defendant's assertion, the prosecutor did not suggest that his "claim of rights" should be considered a factor in aggravation.

Additionally, the prosecutor's argument regarding defendant's lack of remorse was appropriate to show the potential mitigating factor was inapplicable.[44] ▆▆▆ Where, as here, " 'a prosecutor does not suggest that a defendant's lack of remorse should be considered a factor in aggravation,

---

[42]Defendant also claims the prosecutor improperly commented on his refusal to provide the blood and hair samples. However, none of the transcript pages cited by defendant appears supportive of the claim.

[43]When defendant took the stand during the penalty phase, he specifically explained to the jury that he was refusing to discuss the Griswold matter because "since I've been coming to this court, I've learned that if I testify in regards to the Griswold case, then if by the appellate courts I was able to have my confession thrown out and granted a new trial or something, then whatever I might say in this court, they would be able to use that against me as a whole new confession."

[44]To counter the defense's case in mitigation, the prosecutor argued: "But, ladies and gentlemen, his act is transparent to the neutral and critical observer such as you are, and you all know that no matter what words may be used to try and convince us this defendant feels remorse and cares for others, et cetera, et cetera, those are words. And words are easily spoken, but actions speak louder than any words. [¶] And the sadism, premeditation, and ritualistic repetition shown in these crimes are the classic trademark of the psychopath who

he or she properly may comment on the lack of remorse.' " (*People v. Osband* (1996) 13 Cal.4th 622, 724 [55 Cal.Rptr.2d 26, 919 P.2d 640].) Likewise, the prosecutor did not commit misconduct by arguing that defendant did not deserve sympathy and compassion because he had shown none for his victims. (See *People v. Kraft, supra*, 23 Cal.4th at pp. 1076-1077.)

Defendant's contention regarding nonstatutory aggravation also fails. Contrary to his suggestion, the prosecutor never urged the jury to sentence defendant to death because of his consensual sexual relationship with Shawn, a young teenager who later became his wife and mother of his child. Nor did she accuse defendant of having raped Shawn, who testified on defendant's behalf. Viewed in context, the prosecutor's argument told the jury that Shawn's mitigating testimony lacked credibility and that defendant's claim of "loving feelings" for Shawn was questionable. Her argument suggested nothing more.

The prosecutor did not commit misconduct in raising the issue of defendant's future dangerousness. The defense had presented mitigating evidence regarding defendant's good conduct in prison and had urged the jury to consider the point as a mitigating factor. In arguing the issue, the prosecutor properly supported her comments by referring to defendant's past violent conduct. (*People v. Ray, supra*, 13 Cal.4th at p. 353.)

Defendant also asserts that the prosecutor argued against a life sentence based on improper speculation that he would fantasize about his crimes in prison. The assertion, however, is based on a mischaracterization of the record. The prosecutor simply argued that the confessions offered by defendant should not be viewed as mitigating because they were made for self-serving purposes. Directing the jury's attention to the fact that defendant "repeatedly says he doesn't recall or he doesn't remember" certain details of his confessed crimes, the prosecutor properly argued: "And as you saw when he testified, this defendant has an exceptionally detailed and comprehensive memory that is very vividly visual. . . . [¶] Well, if he vividly remembers [small events occurring in his childhood], you better get [*sic*] he's got all these crimes on a mental film he can run back anytime he wants to." No misconduct occurred.

 At times during her closing argument, the prosecutor referred to defendant as a "monster," an "extremely violent creature," and the "beast

feels no remorse and has no concern for anyone outside of himself. He's the beast who walks upright. You meet him on the street. He will seem normal, but he roams those streets, parasitic and cold-eyed, stalking his prey behind a veneer of civility."

who walks upright." She also referred to aspects of defendant's testimony and his case in mitigation as "garbage," "a scam," "obvious ploys," "lies," "baloney," and "a fairy tale." Because defendant did not object or request admonishment with respect to any of this perceived misconduct, he has forfeited the contention on appeal. In any event, the prosecutor's use of such terms, for the most part, constituted fair comment on the evidence presented. (*People v. Sully, supra,* 53 Cal.3d at p. 1249 [use of epithets "can constitute permissible comment regarding egregious comment on defendant's part"]; *People v. Sandoval* (1992) 4 Cal.4th 155, 180 [14 Cal.Rptr.2d 342, 841 P.2d 862] [referring to testimony as "lies" is acceptable "so long as the prosecutor argues inferences based on the evidence" and not on personal belief].) Even if we were to assume that the references to defendant as a "monster" and a "beast" exceeded the bounds of "vigorous yet fair argument" (*People v. Sandoval, supra,* 4 Cal.4th at p. 180), no prejudice is shown in light of the record as a whole.

Defendant further asserts the prosecutor committed misconduct by repeatedly offering her personal opinion on the credibility of mitigation witnesses such as Jace Tompkins and Dr. Davis. (See *People v. Medina* (1995) 11 Cal.4th 694, 776 [47 Cal.Rptr.2d 165, 906 P.2d 2] ["prosecutors should not purport to rely in jury argument on their outside experience or personal beliefs based on facts not in evidence"].) The prosecutor, however, did not rely on her personal experience or on facts outside the record in making her arguments. Instead, she drew reasonable inferences from the testimony and demeanor of these witnesses, and pointed to inconsistencies evident from the trial record. The claim is rejected.

Finally, defendant contends the prosecutor committed misconduct by inviting the jurors to base their sentencing decision on the imagined fear and pain of the victims. The only prosecutorial argument he specifically cites is the following: "[I]t's very difficult to confront the agony and the terror [Barbara Griswold] must have been going through. Every time I think about it my mind recoils." The prosecutor, however, explicitly based her argument on testimonial and photographic evidence regarding the torturous nature of the wounds inflicted upon the victim. This was not a case of unfounded prosecutorial speculation.

In sum, we conclude there was no prejudicial misconduct during the penalty phase. Even assuming some misconduct may have occurred, as discussed, there is no reasonable possibility that a jury would have reached a different result without such misconduct. (*People v. Cunningham, supra,* 25 Cal.4th at p. 1019 [to be prejudicial, "prosecutorial misconduct must bear a reasonable possibility of influencing the penalty verdict"].) Moreover,

defendant has not established that improper remarks by the prosecutor " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright, supra,* 477 U.S. at p. 181 [106 S.Ct. at p. 2471].) Nor does he demonstrate a violation of his right to an individualized and reliable penalty determination.

### 10. *Ineffective Assistance of Counsel*

Defendant contends he received ineffective assistance of trial counsel in several respects during the penalty phase. ▮▮▮ To prevail on such contentions, defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. (*People v. Weaver, supra,* 26 Cal.4th at p. 925; *People v. Freeman, supra,* 8 Cal.4th at p. 484.) Because we are limited to the record on appeal, if the record sheds no light on why counsel acted or failed to act in the manner challenged, then unless counsel were asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, we must reject the contention that counsel provided ineffective assistance. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1058 [5 Cal.Rptr.2d 230, 824 P.2d 1277].)

Defendant first contends that competent trial counsel would have objected to the pervasive prosecutorial misconduct occurring during the penalty phase. To the extent this contention is based upon the perceived instances of prejudicial misconduct addressed and rejected in part II.C.9., at page 196, *ante,* we conclude there was no prejudicial ineffective assistance due to counsel's failures to object. (*People v. Cunningham, supra,* 25 Cal.4th at p. 1038.)

Defendant next asserts that his counsel provided ineffective assistance by failing to invoke statutory safeguards in connection with the automatic motion to modify the verdict under section 190.4, subdivision (e). In particular, he argues that counsel: (1) failed to object to the court's consideration of extraneous or erroneous matter and improper argument; and (2) did not insist that the court more specifically detail its reasons for denying the motion. The claim is without merit. As discussed (*ante,* pt. II.C.8., at

p. 193), the record here demonstrates that the trial court acted on a proper understanding of its statutory duties in deciding the modification motion. Likewise, there is no indication that the trial court relied on inappropriate matters or argument in denying modification.[45]

Defendant additionally argues that his counsel should have objected to the prosecutor's cross-examination regarding the Griswold murder and the Mc-Carthy attempted burglary incident because her questioning exceeded the scope of his direct examination testimony. Specifically, he contends he did not offer testimony on those two matters during his direct examination and complains that the prosecutor improperly questioned him even though he had expressed a desire to refrain from discussing those matters in light of his pending appeal. Even assuming that at least some scope-based objections might have been sustained if made, counsel's reasons for not objecting do not appear in the record, and we are not convinced that there could be no valid tactical reason for choosing not to object. ▉ "[C]ompetent counsel may often choose to forgo even a valid objection. '[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal.' [Citation.]" (*People v. Riel* (2000) 22 Cal.4th 1153, 1197 [96 Cal.Rptr.2d 1, 998 P.2d 969]; see also *People v. Hillhouse, supra*, 27 Cal.4th at p. 502.) These principles compel rejection of defendant's appellate contention.

Defendant further contends that counsel should have objected to the following "argumentative" and factually unsupported question posed to Dr. Davis, the defense psychiatrist: "Were you at that time aware that [defendant] had been planning to fake some form of insanity so that he could do some short time in Atascadero?" The contention is without merit. While on the stand, Dr. Davis confirmed he had reviewed a transcript of a taped interview with defendant's sister-in-law, Vicki Horner, in which she indicated that defendant wanted to go to Atascadero State Hospital and fake insanity. Because this provided adequate foundation for the challenged question, and the question was not argumentative, counsel's omission was reasonable.

Defendant also argues that counsel were ineffective during the penalty phase in allowing him to offer "a formless and incriminating narrative of the Mar homicide without any direction by way of questioning." We disagree.

As the People point out, defendant's narrative of the Mar murder appears to have been carefully prepared and perhaps even rehearsed. At the outset of

---

[45]To the extent defendant claims that age was not a proper factor for the court to consider, he is wrong. (*People v. Brown, supra*, 6 Cal.4th at pp. 338-339.)

the narrative, defendant explained he wanted to "point out facts" to the jurors to show them that the murder was not premeditated. He then related his account of what happened in a step-by-step manner. After finishing his account, defendant countered some of the prosecutor's theories of premeditation and apologized for what happened. Contrary to defendant's assertions on appeal, his penalty phase narrative appeared straightforward, concise, and focused upon the claim that he acted without premeditation.

Moreover, the record contains no indication that the narrative was a result of counsel's decision rather than defendant's decision. (See *In re Horton* (1991) 54 Cal.3d 82, 95 [284 Cal.Rptr. 305, 813 P.2d 1335] [by choosing professional representation, defendant does not surrender the decision as to whether to testify].) To the extent counsel had no choice in the matter, they cannot be blamed. Alternatively, even if the narrative was counsel's idea, defendant fails to establish that there could be no valid tactical reason for presenting the jury with a succinct version of the underlying events that emphasized the absence of premeditation. True, defendant admitted to burglary, rape, and killing in the narrative. But the jury had already determined such facts to be true at the guilt phase, and the admissions were helpful, if not necessary, to lend credibility to the position that the circumstances of the crime were less aggravating than the People claimed.

Finally, defendant contends trial counsel were ineffective in failing to register a doubt as to his competence to stand trial at the penalty phase. To support this claim, defendant notes that: (1) counsel, the prosecutor, and the court at one point commented upon his agitation and apparent willingness to speak out in front of the jury; and (2) defendant claimed a "conflict" with counsel. No ineffectiveness of counsel is shown. Not only do the cited instances fall far short of indicating a deteriorating mental state, but it remains entirely possible that counsel's observations of defendant's behavior outside the courtroom contradicted the position advocated here. In any event, even if counsel had explicitly questioned defendant's competence, it is not reasonably probable that the result would have been different. ■ "[A] trial court is not required to order a competency hearing based on counsel's perception that his client may be incompetent." (*People v. Frye, supra,* 18 Cal.4th at p. 953.) Here, nothing in the record raised a substantial doubt as to defendant's competency; if anything, his lengthy testimony at the penalty phase reflected an individual fully capable of assisting in his own defense.

### 11. *Cumulative Effect of Errors*

Defendant contends the cumulative effect of errors in the guilt and penalty phases of his trial resulted in such a miscarriage of justice as to require

reversal. We disagree. Whether evaluated individually or together, the few errors that may have occurred during the trial were harmless.

## III. DISPOSITION

For the reasons stated above, we find no reversible error in the record. The judgment of death is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied July 31, 2002, and the opinion was modified to read as printed above. Brown, J., did not participate therein.